The STATE of Ohio, Appellee,

v.

CATON, Appellant.

[Cite as *State v. Caton* (2000), 137 Ohio App.3d 742.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–990555.

Decided May 19, 2000.

744

*Angela Stout* and *Scott Rubenstein*, for appellee.

*David Wagner*, for appellant.

GORMAN, Judge.

This appeal presents the issue of whether a grandparent, sharing an apartment with her daughter and two-year-old grandchild, can be convicted of child endangerment based upon the squalor found in the grandchild's bedroom and about the apartment. At the time the squalor was discovered by police entering the apartment, the grandparent was not home; however, based upon the uncontradicted testimony of a child welfare worker, the trial court found that the grandmother shared custody or control of the granddaughter and was therefore criminally liable under the statute. For the reasons that follow, we hold that the evidence was sufficient to support a conviction of child endangerment under R.C. 2919.22(A), and that the conviction was not contrary to the weight of the evidence. Therefore, we affirm.

## FACTS

On July 27, 1998, the police went to the apartment at 2194 Lincoln Avenue in Springfield Township to investigate an anonymous tip that the child on the premises may have been neglected. The child's twenty-one-year-old mother, Jamie Caton, opened the door. Also inside was Jamie's boyfriend, Benjamin Hein, the putative father of the child. After the police entered, they discovered conditions that were later compared to a "pig sty." Testimony indicated that the house had an odor of urine and feces, that the carpet was covered in filth, that dishes were piled in the sink, that pots and pans sat on the stove covered with decaying food, and that insect-laden food sat both in the refrigerator and on the kitchen table.

The child, Jessica, a two-year-old toddler, was found behind a baby gate in the upstairs bedroom, naked and alone. Dirty diapers were on the floor, according to the investigating officers, as well as a plastic bag. Fecal matter was found upon the carpet, walls, window, furniture, and Jessica herself. With respect to the latter, an officer at the scene testified that Jessica had what he thought to be fecal matter on her hands and face. At that point, police summoned representatives of the Hamilton County Department of Human Services. A child welfare worker familiar with the family, Colleen Turner, arrived on the scene and determined that the environment threatened Jessica with illness, and the child was removed from the home and taken to a hospital to be examined. The hospital examination determined that Jessica was healthy and not suffering from any contagious disease.

Jamie Caton and Benjamin Hein were arrested at the scene, taken into custody, and charged with child endangerment in violation of R.C. 2919.22(A). Debbie Caton, Jamie's mother, who police believed resided in the apartment, was later charged with the same offense. The three defendants were then tried jointly.

Neither Jamie nor Debbie Caton testified at trial. The manager of the apartment testified that Jamie Caton was the named tenant on the lease. She stated that she was unaware of anyone other than Jamie and Jessica living in the apartment. She testified that Debbie Caton was present when Jamie made application for the apartment and that she had seen Debbie Caton at the apartment during the summer months, cleaning carpets "[m]aybe three or four times." She testified that she was aware, also, that Debbie had the telephone and electric bills placed in her name "because Jamie was physically not able to do that." However, she stated that Debbie Caton was not a resident of the apartment to her knowledge, and that it would have violated the Section 8 provisions of the lease for Jamie to have a co-tenant without first seeking permission.

Debbie Caton's ex-husband testified that, to his knowledge, both Debbie and Jamie lived at the Lincoln Avenue apartment. Asked how he knew this, he stated, "Because when they moved out from Galbraith Road, where their other apartment was, Debbie took me over I think a day or two later over to show me their new apartment, hers and Jamie's, where they were living at." According to her ex-husband, Debbie Caton "told me it was their new apartment where her and Jamie were living at." He stated that he was over at the apartment on three or four occasions and that Debbie Caton was normally there. He stated that when he called on the telephone, either Debbie or Jamie would usually answer.

The neighborhood letter carrier for the United States Postal Service testified that on July 27, 1998, both Debbie and Jamie Caton were having mail delivered to

the Lincoln Avenue apartment. He admitted, though, that he had no personal knowledge of who was living in the apartment.

Colleen Turner, the child welfare worker for the Department of Human Services, testified that she had been familiar with Debbie Caton and Jamie Caton since June 1996. She stated that the "the case" had come to the attention of the department "as a result of a finding of physical abuse of Jessica." She testified, without objection, that "[f]or the majority of time since we received the case in Ongoing in June of '96, Debbie Caton resided in the home of Jamie Caton, assisting Jamie in providing care for Jessica Caton. There were periods when she was not living in the home, but Debbie Caton did reside in the home and participated in the care of Jessica Caton." Turner testified, again without objection, that she came to this conclusion through "numerous telephone conversations" with Debbie Caton and three previous personal contacts with Debbie Caton at the home on Galbraith Road. She stated that Debbie Caton was residing with Jamie and Jessica because she felt that Jamie had "some mental retardation issues," and that Debbie Caton had, therefore, "essentially * * * assumed responsibility for the household and for her daughter and for assuring that her daughter provided for her granddaughter." Furthermore, Turner stated, Debbie Caton insisted that she be present whenever the department attempted to have contact with Jamie to report on Jessica.

Turner testified that, after taking Jessica to the hospital, she and the staff took responsibility for cleaning the child. She stated that matter removed from Jessica's feet and other parts of her body had "the color of feces, the odor of feces, the texture per se of feces." Turner further described Jessica's feet as orange "from having walked around in what we determined was fecal matter."

Turner testified that the most "significant physical hazard" witnessed by her when she removed Jessica from the home was "the fact that the child was unsupervised upstairs, gated in a room where there were no toys, no clothes, and there was feces, whether it be human or animal, smeared all over the furniture, carpet, wall and screen." She stated that she found evidence of neglect "based on conditions of the home, the hygenic condition of the child and * * * the supervision of the child."

Both Jamie and Debbie Caton were found guilty of the offense, while the charge against Benjamin Hein was dismissed pursuant to a Crim.R. 29 motion.

## ANALYSIS

Debbie Caton raises six assignments of error, all of which challenge the weight and sufficiency of the evidence underlying her conviction for violating R.C. 2919.22(A). That subsection provides the following:

"No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age * * * shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support."

Both the state and Caton agree that the elements of the offense required the state to show that she (1) had custody or control of Jessica, (2) violated a duty of care toward Jessica, (3) created a substantial risk to Jessica's health, and (4) acted with the mental state of recklessness. *State v. McGee* (1997), 79 Ohio St.3d 193, 680 N.E.2d 975.

The trial court, in its written decision, found specifically that Caton lived with her daughter and granddaughter at 2194 Lincoln Avenue on the date in question. The trial court also found that it was "uncontradicted" that Caton "played an ongoing and active role in the care of Jessica Caton." The court explained:

"In this regard, Colleen Turner, the child welfare worker from the Hamilton County Department of Human Services[,] testified without contradiction that she had worked with both Jamie and Debbie Caton concerning the care of Jessica virtually since June, 1996. She noted that for the majority of Jessica Caton's life, Debbie Caton had resided with her and provided care to her along with her mother, Jamie Caton. As Colleen Turner testified, Defendant Debbie Caton had assumed responsibility for the household and for her daughter and for assuring that her daughter provided for her granddaughter, Jessica Caton. Debbie Caton was in the home every time the caseworker visited there. She insisted that she be present whenever Jamie met with the social worker and Debbie Caton herself had several telephone conversations directly with Colleen Turner concerning Jessica's care. For all these reasons, the Court finds that Debbie Caton assumed such care of Jessica Caton and had such relationship with the child that she had the 'custody and control' of Jessica Caton which gives rise to a duty of care, protection, and support for breach of which criminal liability can be found."

*1. Loco Parentis, Custody or Control*

In her first and second assignments of error, Caton argues that the evidence was insufficient to establish either that she stood in loco parentis to her granddaughter or that she exerted custody or control over her. We disagree.

As Caton points out, the law does not impose obligations on a grandparent toward his or her grandchild simply by virtue of the relationship. As this court has previously held, the "duty of care, protection, or support" provided for in R.C. 2919.22(A) "refers only to those duties toward the child as are imposed by law." *State v. Erwin* (Feb. 24, 1993), Hamilton App. No. C–920293, unreported, 1993 WL 50944, citing *State v. Sammons* (1979), 58 Ohio St.2d 460, 12 O.O.3d 384, 391 N.E.2d 713, appeal dismissed (1980), 444 U.S. 1008, 100 S.Ct. 655, 62 L.Ed.2d 637.

Moral, humanitarian, or filial obligations, no matter how imperative, will not suffice in the absence of a legal duty.

A grandparent in loco parentis, however, is responsible under the law to discharge the duties of a parent's care and protection. *Erwin, supra.* In *State v. Hayes* (1987), 31 Ohio App.3d 40, 31 OBR 56, 507 N.E.2d 1176, we defined "in loco parentis" to mean "person in place of a parent." Whether a person stands in loco parentis is a factual question. The term does not signify a formal investiture—in *Erwin, supra,* an admission by the stepfather that he cared for the child and brought her formula was deemed sufficient for the jury to infer that he intended to stand in loco parentis.

Furthermore, grandparents not in loco parentis to the child may, nevertheless, still owe a legal duty of care and protection to the child if the child is in their custody or control. For example, a grandfather who molested his grandchildren while they were living with their mother in his home was found to have sufficient "custody" of the grandchildren for purposes of the statute. *State v. Smith* (Jan. 25, 1996), Cuyahoga App. No. 68745, unreported, 1996 WL 28583.

Although Caton challenges the sufficiency of the evidence that she lived at the Lincoln Avenue apartment, we hold that the testimony of her ex-husband, Turner, and the mailman was sufficient to support an inference that she resided on the premises. It is well settled that an appellate court will not reverse a trial court's finding of fact based upon insufficient evidence where the finding is supported by some competent, credible evidence. Further, the evidence and the inferences to be drawn from the evidence must be viewed in the light most favorable to the prosecution. *State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717. The test of sufficiency does not assess whether the state's evidence is to be believed, but only, if it is believed, whether the evidence would be sufficient to support the trial court's finding. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541, 549 (Cook, J., concurring). Here, if believed, the evidence was clearly sufficient to establish that Caton resided in the apartment.

With respect to whether Caton had custody or control of Jessica, we again hold that there was sufficient evidence to support the trial court's conclusion that she did. Turner testified that, in her professional opinion, based upon personal visits and telephone conversations, Caton had assumed responsibility for assuring that her daughter took care of her granddaughter. Turner's testimony was presented without objection. More important, her testimony was not contradicted, since the defense did not put on any evidence. A reasonable trier of fact could, based upon

Turner's testimony and the fact that Caton resided in the apartment, infer that Caton shared custody or control of Jessica with Jamie.

We hold, therefore, that there was sufficient evidence to support the conclusion that Caton had custody or control of her granddaughter. We emphasize that this holding follows from Turner's uncontradicted testimony regarding the nature of the relationship between Caton and her daughter and granddaughter, and not simply upon the fact that Caton was Jessica's grandmother living on the premises.

Accordingly, we find no merit in Caton's first and second assignments of error.

2. *Substantial Risk*

In her third and fourth assignments of error, Caton argues that there was insufficient evidence in the record to support the conclusion that she created, either by action or omission, a substantial risk to the health of her granddaughter, Jessica. She points, in this regard, to the absence of evidence that Jessica suffered from any contagious disease. With respect to the risk that Jessica may have consumed fecal matter, she argues that "the State here failed to present any testimony to show that ingestion of fecal matter poses a substantial risk to a child's health and safety." Again we disagree.

R.C. 2901.01(H) defines "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." As Caton correctly points out, this court has held that this section does not permit the trier of fact to make "inference upon inference" in order to transform a speculative risk into a substantial risk. *State v. Martin, supra.*

In its written opinion, the trial court made a finding that the Caton apartment "was, in fact, filthy." The trial court also expressly concluded that a substantial risk to Jessica's health was presented by a "feces-encrusted home, with moldy, rotten food, garbage and insects attracted to same, which has a pervasive stench and in which the child is placed in a gated room with no toys, and the window screen is partially detached * * *." Further, citing *State v. Caulley* (Oct. 23, 1998), Montgomery App. No. 17066, unreported, 1998 WL 735908, the trial court rejected the argument that "expert testimony is required to prove that a filthy, feces contaminated environment constitutes a substantial risk to the health or safety of a child."

We agree that expert testimony is not required to find that feces are a potential source of disease. It is a simple rule of hygiene that germs and bacteria breed in filth and excrement. It is a matter of logic, therefore, that a child whose feet are orange from feces, and who has feces in the folds of her skin,

is being exposed to a known health risk. Additionally, insects are known to harbor and transmit disease. Plastic bags such as those found in Jessica's room have been known to cause suffocation. An unsecured window screen creates a risk that the child might somehow fall through.

The question is, ultimately, whether all these environmental factors combined to put Jessica's health at "substantial risk" as ·defined in R.C. 2901.01(H). We do not consider Jessica's absence of contagious disease to be dispositive, since it is the risk, not the actuality of injury, with which the statute is concerned. Furthermore, where the risk is presented by environmental factors such as filth and excrement, it must be recognized that while the risk may be less palpable, it is no less real than in situations where the child is overtly threatened by physical behavior.

While we eschew any bright-line rule in so-called "filthy-home" cases, we are convinced that the environment in which Jessica was found created a substantial risk of contagious disease or accident. This is not a case such as *Martin, supra,* where the state is seeking to punish a parent for putting a child at speculative risk due to a single imprudent act. There is nothing speculative about the risk to a child whose feet are tinctured with fecal matter due to the chronic squalor in which she is forced to live.

The next question that arises is whether there was sufficient evidence to have found that Caton caused the risk. In addressing this issue, the trial court found that the evidence was uncontradicted that Caton lived in the home and that "the conditions in the home occurred over a period of time." As stated by the trial court:

"The dried food about the house and dried feces on the walls and carpet in Jessica's room indicate that the filth did not just appear instantaneously. As an adult living there, the Court finds that Defendant Debbie Caton knew of the conditions of the home where she resided and that she took no action to alleviate them and protect Jessica Caton from the risks they posed to the child's health and safety."

We agree with the trial court's analysis. While it is true, as Caton argues, that there was no evidence that she physically created the conditions that surrounded Jessica (she argues, for example, that there was no evidence that she actually placed the feces in the child's bedroom), we do not find such evidence necessary to her conviction. Nor do we find persuasive her argument that "[a]t most, [Caton's] failure to remove Jessica from the dirty bedroom may have heightened the pre-existing risk to Jessica's safety, a risk that was directly created by Jamie Caton's poor housekeeping and not by Debbie Caton's conduct." There was no evidence presented that the dirty bedroom was the result of Jamie Caton's poor

housekeeping, as opposed to Caton's. The duty of care and protection Caton owed Jessica, moreover, did not depend on who created the mess. Rather, the duty arose as a result of Caton's custody or control of Jessica, and the breach of that duty was her failure to do anything to remove Jessica or ameliorate the harmful conditions surrounding the child.

*3. Recklessness*

In her fifth assignment of error, Caton argues that there was insufficient evidence that she acted recklessly with regard to Jessica's condition. She argues that the state failed to present any evidence that she had knowledge of the "substandard apartment conditions to which Jessica was exposed." or that she was aware that "she may have owed a duty of care to Jessica." We are not persuaded by either argument.

A person acts recklessly with respect to circumstances when, "with heedless indifference to the consequences, he [or she] perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C). Based on this record, we hold that there was sufficient evidence for the trial court to have concluded that Caton must have known of the risk to Jessica, and that she perversely disregarded that risk. It was reasonable to infer that anyone living in the apartment was aware of the deplorable conditions. The fact that Caton may have been oblivious to the duty of care she owed her granddaughter did not negate her duty.

*4. Weight of the Evidence*

In her sixth and final assignment, Caton challenges her conviction based upon the weight of the evidence.

The role of a reviewing court in reviewing a challenge to the weight of the evidence was set forth in *Thompkins:*

"When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting evidence. *Tibbs* [*v. Florida* (1982), 457 U.S. 31] at 42, 102 S.Ct. [2211] at 2218, 72 L.Ed.2d [652] at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')." *Thompkins, supra,* at 387, 678 N.E.2d at 546–547.

■ Caton argues that society cannot punish "every grandparent, even grandparents who are highly involved in the lives of their grandchildren, for parenting mistakes made by the children's actual parents." While such a statement is generally true, we believe that society can punish a grandparent who lives with a grandchild, shares in the custody or control of the child, and recklessly allows the child to remain in an environment that puts the child's health and safety at substantial risk. Based upon the evidence of record, we hold that the trial court did not lose its way or create a manifest miscarriage of justice by concluding that Caton was guilty of breaching her duty to her granddaughter.

Accordingly, Caton's six assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

HILDEBRANDT, P.J., and SHANNON, J., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.