OPINION
This case comes before this court on Petitioner-Appellant Katharine Dvorak's appeal of the judgment of the Miami County Common Pleas Court, Juvenile Division, dismissing her complaint for the allocation of parental rights and responsibilities of Cheyenne Madison Jones, born April 21, 1995.
On November 19, 1999, Dvorak filed a complaint for custody, visitation, and support of Cheyenne in the Miami County juvenile court. The complaint alleged that Dvorak had resided with Cheyenne's biological and legal mother, Respondent-Appellee Evangeline Jones ("Jones"), for several years prior to Cheyenne's birth and that she had helped plan Cheyenne's conception and birth. Dvorak asserted that, after Cheyenne's birth, she had acted as one of Cheyenne's co-custodians, providing care and support for her for several years. Dvorak and Jones separated in 1997, and visitation occurred regularly between Cheyenne and Dvorak until September of 1999. Dvorak alleged that the termination of contact by Jones was not in Cheyenne's best interest, and she requested that the juvenile court determine custody, visitation, support and other relevant matters pertaining to this case.
The juvenile court granted interim visitation, and Jones quickly responded by filing a motion to vacate the juvenile court's order. Jones asserted that Dvorak had not been related to Cheyenne but had simply served as her "babysitter." According to Jones, Dvorak was unstable, would enter into "rages" in front of Cheyenne, and made comments which were "detrimental and confusing" to Cheyenne.
Jones also filed a motion to dismiss Dvorak's complaint, asserting that the juvenile court did not have jurisdiction to hear the complaint for custody and that Dvorak had no standing to bring the complaint because she was not biologically or legally related to Cheyenne.
A hearing was held on December 17, 1999, from which the following facts were adduced. Dvorak and Jones met in 1990 and began dating thereafter. At that time, Jones was a nineteen year old student at Wright State University, and Dvorak was a forty-nine year old professor at Wright State University. The couple moved in together and decided to have a child. Jones was artificially inseminated with sperm from a donor of Czechoslovakian and German heritage, the same heritage as Dvorak. The couple attended birthing classes together, and showers were thrown for both Jones and Dvorak. During the birth, Dvorak served as Jones' coach, was the only individual permitted in the delivery room, and cut the umbilical cord. Cheyenne's name was chosen to represent the birth cities of both women. Additionally, both women's names were on the birth announcement and the baptismal announcement.
According to Dvorak, she and Jones had shared equally the responsibilities for Cheyenne, and both women had been actively involved in parenting and in decision making. After problems arose with her employment, Dvorak served as the daytime caretaker of Cheyenne when Jones went back to work in early July through December of 1995. After Dvorak resumed work, the couple hired a babysitter, Cassandra Marie Feldman, to "fill in the gaps" and care for Cheyenne while they were at work.
Feldman testified that, aside from her serving as Cheyenne's babysitter, she and her husband had also enjoyed a social relationship with Dvorak and Jones. Feldman stated that Dvorak and Jones had acted very much like a married couple and had split the care-taking responsibilities for Cheyenne. Despite the stress that Dvorak had undergone with her employment problems in 1995, Feldman commented that Dvorak had not "blow[n] up" in anger and that Dvorak had not taken out her stress on either Cheyenne or Jones.
Conversely, Jones testified that her relationship with Dvorak had been fraught with problems. Jones claimed that, when Cheyenne was born, she had assumed ninety percent of the responsibility of taking care of Cheyenne and that Dvorak had not been interested in helping her with Cheyenne. Moreover, Jones stated that the stresses from Dvorak's troubles with Wright State University had taken a toll on their relationship and on Dvorak's relationship with Cheyenne.
According to Jones, she withdrew visitation from Dvorak because of "trust issues," evidenced by Dvorak's production of portions of Cheyenne's baby book at trial. Jones also felt that Dvorak had not been following her parenting instructions. She believed that Dvorak had been manipulating and confusing Cheyenne with talk about Dvorak being "mommy" and talk about Dvorak's relatives also being Cheyenne's relatives. Jones denied that Dvorak had held a special place in Cheyenne's life, and she stated that Dvorak would merely fall under the category of "friend" to Cheyenne.
Interestingly, despite Jones' statement in her brief that Dvorak was merely a "babysitter" to Cheyenne, the pages of Cheyenne's baby book that were submitted as evidence during trial suggest otherwise. Jones journaled in Cheyenne's baby book that Cheyenne had "two mommies." Dvorak's history and heritage were reflected on the "father" page in the book. Additionally, there were references in the book to Dvorak fulfilling more of a parental role to Cheyenne than "babysitter."
Jones moved out of the residence with Cheyenne on March 30, 1997. Jones allowed regular daytime visitation between Cheyenne and Dvorak for the next two years, but abruptly terminated the visitation in September of 1999.
The magistrate filed her decision and entry on January 19, 2000. She found that the court had jurisdiction to hear the custody matter and that the appropriate standard to follow was that in In re Perales (1977),52 Ohio St.2d 89. In Perales, the court found that, to obtain custody of a child, a non-parent must prove that a parent is "unsuitable" to overcome a parent's paramount right to custody. Dvorak was ordered to file a supplemental pleading to comply with Perales. On February 3, 2000, Dvorak filed a supplement to her complaint for custody, asserting that she should be treated as a de facto parent and that she should be subject to the deference afforded a parent instead of placing her behindPerales' "high wall" of having to prove that Jones was unsuitable.
The magistrate dismissed Dvorak's complaint on March 20, 2000. The decision found that there was no authority for Dvorak to be considered ade facto parent. The magistrate likened Dvorak's situation to that of "a stepfather with whom an out of wedlock child has been raised since birth, and is now party to a divorce with the biological mother." (Doc. No. 23, p. 1) The magistrate further noted that "[t]here is no special dispensation in Ohio for those who have considered themselves as parents but who have no legal relationship with the child." Id. For those reasons, the situation was evaluated using the Perales standard. Since Dvorak had failed to allege that Jones had either abandoned Cheyenne or contractually relinquished custody of her and there had been no evidence that Jones was "unsuitable" under Perales, the magistrate found that Jones could not be divested of her custodial rights, including those she exercised in terminating visitation with Dvorak.
Dvorak filed objections to the magistrate's decision on April 5, 2000. Supplemental objections were filed on July 20, 2000, urging the juvenile court to find that she stood in loco parentis to Cheyenne and thus to evaluate custody and visitation as though Jones and Dvorak were on equal footing.
On October 13, 2000, the juvenile court affirmed the magistrate's decision and found that Dvorak had produced no Ohio law to support her argument that she should be found to be a de facto parent. Instead, the court found that, under the current Ohio law, Dvorak is a non-relative and subject to the standards in Perales. Dvorak now appeals that decision, asserting three assignments of error. Several amici filed briefs supporting Dvorak's arguments, including the Lambda Legal Defense and Education Fund, the National Center for Lesbian Rights, and the American Civil Liberties Union Foundation.
For ease of organization, we will address Dvorak's first and second assignments of error together.
 I.
"The Juvenile Court erred when it dismissed appellant's complaint for failure to state a claim.
 II.
"The Juvenile Court erred by holding that Appellant did not state a valid claim, because in fact she showed appellee voluntarily agreed to relinquish her right to sole custody, and that the parties shared parental duties."
The issue presented in these assignments of error is whether the juvenile court erred in affirming the magistrate's decision to proceed with the case under the Perales standard and in not assessing the situation under the best interest of the child standard.
Under Ohio law, child custody disputes fall within the coverage of either R.C. 3109.04 or R.C. 2151.23. R.C. 3109.04 provides guidance to domestic relations courts for the allocation of parental rights and responsibilities between divorcing parents. R.C. 3109.04(D)(2) permits a domestic relations court, under certain circumstances, to award custody of a child of divorcing parents to a relative of the child other than one of the parents when it is in the best interest of that child. The other statute, R.C. 2151.23(A)(2), gives juvenile courts exclusive jurisdiction "to determine the custody of any child not a ward of another court of this state[.]" Thus, based upon this section, the juvenile court had jurisdiction to hear this case. However, there is no standard in the Ohio Revised Code to guide a juvenile court in determining custody disputes between a parent and a non-parent under R.C. 2151.23(A)(2).
There is, however, Ohio case law addressing the issue. Generally, juvenile court custody disputes between parents and non-parents are governed by the Ohio Supreme Court's decision in In Re Perales (1977),52 Ohio St.2d 89. In Perales, Shirley Perales placed her newborn baby in the care of a non-relative, and signed an agreement purporting to give custody to the non-relative, because she was afraid her husband would harm the baby. More than two years later, a dispute arose and Perales filed a complaint for return of the child and for custody in the juvenile court. The court awarded custody of the child to the non-relative based upon the best interest of the child test under R.C. 3109.04. Perales appealed, and the court of appeals found error in the trial court's failure to make a finding of "unsuitability" on behalf of Perales.
The supreme court found that it was improper for the trial court to rely on R.C. 3109.04 because, under that section, the opposing parties are usually the child's parents, who both have a right to custody and who both stand on equal footing and a finding of unsuitability would be inappropriate. Id. at 96. Accordingly, in custody actions between parents, the best interest of the child test should govern because "the welfare of the child would be the only consideration before the court."Id.
In setting the standard to use in custody actions between a parent and a non-parent, the Perales court acknowledged:
 "in all cases of controverted right to custody, the welfare of the minor is first to be considered," but [the Clark court] also determined that parents who are "suitable" persons have a "paramount" right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." Id. at 97, quoting Clark v. Bayer
(1877), 32 Ohio St. 299, paragraphs one and two of the syllabus.
Thus, the Perales court concluded the following:
 "In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability — that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." Id. at syllabus.
Moreover, under Perales, if a parent contracts custody rights to a non-parent, the parent may be considered to have "forfeited his right to custody of such child, and may accordingly be found to be unsuitable for custody." Masitto v. Masitto (1986), 22 Ohio St.3d 63, 65. It is a question of fact for the juvenile court to determine whether a parent relinquishes custodial rights. Id. at 66. This determination will be upheld on appeal as long as there is reliable, credible evidence to support the finding. Id. (Citation omitted.)
In this case, there is evidence in the record that Dvorak is not a relative or a parent to Cheyenne. We thus find that the juvenile court's application of the "suitability" test enunciated in Perales was the proper standard with which to make its custody determination.
To prove unsuitability, Dvorak asserts that Jones did contractually relinquish her right to sole custody by allowing Dvorak to step into a parental role and assume a substantial portion of the responsibilities. She therefore concludes that it was error for the juvenile court to dismiss her claim, as she did sufficiently plead her case.
The magistrate found that Dvorak's claim of unsuitability rested on Jones' restriction of contact and visitation between Cheyenne and Dvorak. The magistrate dismissed the complaint because Dvorak's allegations did not rise to the "total inability of [Jones] to provide care or support" to Cheyenne, and because Dvorak "[did] not offer any allegations that [Jones] has abandoned the child or has contractually relinquished custody." Doc. No. 23, p. 1.
We agree with the juvenile court's interpretation of the law. The record clearly evidences a close relationship between Cheyenne and Dvorak, however we know of no Ohio law that allows for "relinquishment" to occur in a situation where a parent allows a non-parent to be a part of the child's life while that parent still maintains care and support. Under current Ohio law, there is nothing preventing a parent from terminating a relationship between a child and a non-parent who has no visitation rights. Despite the questionable motivation behind Jones' action of breaking the strong bond between Dvorak and Cheyenne preventing Dvorak from visiting with Cheyenne, Dvorak failed to provide evidence that Jones was "unsuitable."
Accordingly, we must overrule Dvorak's first and second assignments of error.
 III.
"The Juvenile Court erred when it failed to consider or deem valid Appellant's claim for custody under the doctrine of in loco parentis, asshe is a de facto parent."
Dvorak urges this court to reverse the juvenile court's decision because it failed to find her to be a de facto parent based upon her status of being in loco parentis to Cheyenne. To support her assertions, Dvorak relies heavily on cases from other jurisdictions that analyze custody situations where a non-parent, unrelated to the child by blood or marriage, has undertaken the duties of a parent and been found to be a de facto parent for custody determinations. See VC v. MJB
(2000), 163 N.J. 200, 748 A.2d 539, J.A.L. v. E.P.H. (1996),453 Pa. Super. 78, 682 A.2d 1314, In re H.S.H-K (1995), 193 Wisc.2d 649,533 N.W.2d 419. In particular, Dvorak points to the VC court, which set out a four-factor test that a non-parent petitioner must satisfy to be found a de facto parent who would be evaluated on equal footing with a biological or adoptive parent. Dvorak urges this court to adopt the same analysis and to find her to be in loco parentis to Cheyenne, thus placing her on "equal footing" with Jones for the custody analysis.
The term "in loco parentis" has traditionally been defined in Ohio as "the relationship which a person assumes toward a child not his own, holding him out to the world as a member of his family toward whom he owes the discharge of parental duties[.]" Evans v. Ohio State Univ. (1996), 112 Ohio App.3d 724, 736, quoting In re Estate of George (App. 1959), 82 Ohio Law Abs. 452, 455. Moreover, "a person standing in loco parentis to a child is one who had put himself in the situation of a lawful parent assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption." Id., quoting In re Estate of George, supra, at 455.
There are numerous cases in Ohio that discuss the phrase "in locoparentis" in the context of criminal statutes and other liability statutes. See, generally, State v. Noggle (1993), 67 Ohio St.3d 31,State v. Caton (2000), 137 Ohio App.3d 742, Evans v. Ohio St. Univ. (1996), 112 Ohio App.3d 724, State v. Hayes (1987), 31 Ohio App.3d 40,State v. Voland (1999), 99 Misc.2d 61, In re Bolser (Jan. 31, 2000), Butler App. Nos. CA-99-02-038, CA-99-03-048, unreported. These cases have found that non-parents such as teachers, babysitters, step-parents and grandparents can be held criminally or civilly liable because they stood in loco parentis to a child. However, no Ohio case has analyzed the relationship between in loco parentis and a custody proceeding under R.C. 2151.23(A)(2).
R.C. 2151.23(F)(1) states that the juvenile court must exercise its jurisdiction in child custody matters in accordance with R.C. 3109.04. R.C. 3109.04(A)(1) provides the following:
 "the court, in a manner consistent with the best interest of the children, shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children."
In wording the statute, the General Assembly provided juvenile courts with the power of allocating parental rights and responsibilities to "parents." The issue then becomes who is a "parent" for purposes of the statute. We note that no definition of "parent" appears in R.C. 3109.04, however R.C. 3111.01(A) defines "parent and child relationship":
 "As used in sections 3111.01 to 3111.85 of the Revised Code, "parent and child relationship" means the legal relationship that exists between a child and the child's natural or adoptive parents and upon which those sections and any other provision of the Revised Code confer or impose rights, privileges, duties, and obligations. The "parent and child relationship" includes the mother and child relationship and the father and child relationship." (Emphasis added.)
In Liston v. Pyles (Aug. 12, 1997), Franklin App. No. 97APF01-137, unreported, the appellate court applied the definition of "parent and child relationship" under R.C. 3111.01(A)(1) to the child support and visitation provisions of R.C. 3103.03(A) and 3109.051(B)(1). Based upon the analysis in Liston, the First District Court of Appeals extended this definition to R.C. 3109.04 in In re Ray (Feb. 16, 2001), Hamilton App. Nos. C-000436, C-000437, unreported. The Ray court concluded that "`parent,' for the purposes of R.C. 3109.04, includes only the natural or adoptive parents of a child."
We join the Ray court and find that, for purposes of a custody determination under R.C. 2151.23(A)(2), a "parent" is the natural or adoptive parent of a child as stated in R.C. 3111.01(A)(1). We also agree with the Ray court that it is up to the General Assembly to recognize a broader definition of "parent" than that currently contained in the Revised Code.
Based upon the above discussion, because Dvorak is neither the natural nor the adoptive parent of Cheyenne, she cannot be a "parent" within the meaning of R.C. 3109.04, and she is not entitled to an award of parental rights under the statute without first proving that Jones is unsuitable under Perales.
Accordingly, we conclude that the juvenile court properly overruled Dvorak's objections and affirmed the magistrate's decision. Dvorak's third assignment of error is overruled.
The judgment of the juvenile court is affirmed.
FAIN, J. and GRADY, J., concur.
(Hon. Stephen W. Powell sitting by assignment of the Chief Justice of the Supreme Court of Ohio).