[Cite as *State v. Knepley*, 2012-Ohio-406.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                 CASE NO.  7-11-02

      v.

DAVID E. KNEPLEY,                   O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Henry County Common Pleas Court
Trial Court No. 08-CR-0033

**Judgment Affirmed**

Date of Decision:   February 6, 2012

APPEARANCES:

    *Nicole M. Winget*  for Appellant

    *John H. Hanna*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, David E. Knepley (hereinafter "Knepley"), appeals the Henry County Court of Common Pleas' judgment of conviction and sentence entered against him following a jury trial where Knepley was found guilty of one count of endangering children and one count of involuntary manslaughter. For the reasons that follow, we affirm.

{¶2} On the evening of August 14, 2007, Knepley was at Candlelite Apartments with Jayme Schwenkmeyer (hereinafter "Schwenkmeyer") and her thirteen month old child, G.K. (Video of Knepley's interview with police, Ex. 12). G.K. had hiccups and could not sleep. (Ex. 12). Schwenkmeyer went to bed while Knepley stayed up with G.K. (Feb. 16, 2011 Tr. at 1535).

{¶3} Knepley put G.K in her crib around 5:30 a.m. on August 15, 2007. (Feb. 14, 2011 Tr. at 1277). Knepley left the apartment to run errands shortly thereafter. (Feb. 16, 2011 Tr. at 1277). Knepley returned to the apartment a few hours later. (*Id*.). Schwenkmeyer was still asleep at that time. (*Id*.). Knepley checked on G.K. and could tell something was wrong. (Feb. 15, 2011 Tr. at 1348). Schwenkmeyer and Knepley took G.K. to the hospital where she was pronounced dead at 2:10 p.m. (Feb. 14, 2011 Tr. at 1236). A subsequent autopsy revealed that G.K. had a byproduct of Xanax in her urine and a byproduct of Oxycodone in her blood and urine. (Feb. 16, 2011 Tr. at 1504-10). The Henry County Coroner

concluded that G.K. had consumed a toxic amount of Oxycodone and Xanax, causing her death. (*Id.*).

{¶4} On April 24, 2008, the Henry County grand jury indicted Schwenkmeyer and Knepley on one count each of endangering children in violation of R.C. 2919.22(A)(E)(1)(c), a felony of the third degree, and one count each of involuntary manslaughter in violation of R.C. 2903.04(A), a felony of the first degree. (Doc. No. 1).

{¶5} On July 14, 2008, Schwenkmeyer filed a motion to sever her trial from Knepley's trial. (Doc. No. 32). The State filed its response to the motion to sever on August 27, 2008. (Doc. No. 41). On September 5, 2008, Knepley filed a request for relief from prejudicial joinder. (Doc. No. 46). Schwenkmeyer filed a second motion to sever the trials on September 15, 2008. (Doc. No. 49). On February 13, 2009, the trial court ordered that the trials of Schwenkmeyer and Knepley be severed. (Doc. No. 69).

{¶6} The Henry County Court of Common Pleas held a jury trial on Knepley's case from February 7, 2011 through February 17, 2011. (Doc. Nos. 479-487). On March 8, 2011, the jury found Knepley guilty on both counts. (Doc. No. 443-444).

{¶7} The trial court held a sentencing hearing on April 12, 2011. (Doc. No. 464). The trial court determined the offenses of endangering children and

involuntary manslaughter were allied offenses of similar import and merged the endangering children conviction into the involuntary manslaughter conviction. (*Id*.). The trial court sentenced Knepley to eight years imprisonment on the involuntary manslaughter conviction and five years of mandatory post-release control. (*Id*.).

{¶8} On April 22, 2011, Knepley filed a timely notice of appeal and now raises eight assignments of error. For purposes of our discussion, we will address some of the assignments of error out of the order presented in the briefs and combine them where appropriate.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT BY GIVING INCOMPLETE AND MISLEADING JURY INSTRUCTIONS.**

{¶9} In his first assignment of error, Knepley argues the trial court erred when it used its standard in loco parentis jury instruction rather than the instruction Knepley had requested. Knepley had requested the trial court instruct the jury that the definition for in loco parentis is "a relationship in which a person has voluntarily assumed the dominant parental role and is responsible for the financial maintenance, care, and education of the child in the same manner as an actual parent." (Doc. No. 334). Instead, the trial court instructed the jury that "[i]n

loco parentis means standing in the place of a parent and assuming parental duties or responsibilities." (Feb. 17, 2011 Tr. at 1777).

{¶10} A trial court's decision whether to use the jury instructions the defendant requested is reviewed for an abuse of discretion. *State v. Guster*, 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (1981). The Supreme Court of Ohio has held that "it is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." *State v. Scott*, 26 Ohio St.3d 92, 101, 497 N.E.2d 55 (1986). However, this Court has held that a trial court is not required to use the defendant's requested instruction verbatim. *State v. Smith*, 3d. Dist. No. 1-05-39, 2006-Ohio-1661, ¶ 29. Instead, the trial court may use its own language to present the requested jury instruction. *Id*. This Court "must examine the context of the overall charge to determine if the court properly instructed the jury on the issues requested." *Id*., citing *State v. Sneed*, 63 Ohio St.3d 3, 9, 584 N.E.2d 1160 (1992).

{¶11} The Supreme Court of Ohio has defined in loco parentis as "a person who has assumed the dominant parental role and relied upon by the child for support." *State v. Noggle*, 67 Ohio St.3d 31, 615 N.E.2d 1040, paragraph one of the syllabus (1993). This person "has assumed the same duties as a guardian or custodian, only not through a legal proceeding." *Id*. at 33. The Ohio Jury Instructions define in loco parentis as "standing in the place of a parent and

Case No. 7-11-02

assuming parental duties or responsibilities." 2 Ohio Jury Instructions, Section 507.03, at 10 (2011).[1]

{¶12} We cannot find that the trial court erred by instructing the jury that in loco parentis "means standing in the place of a parent and assuming parental duties or responsibilities." This jury instruction states, verbatim, the Ohio Jury Instruction for in loco parentis. It also fairly reflects Ohio case law, which holds a person stands in loco parentis to a child when that person has assumed the dominant parental role. *Noggle* at paragraph one of the syllabus. Furthermore, "parental duties or responsibilities" would include financial maintenance, care, and education, the specific responsibilities Knepley requested the trial court include. Since the jury instructions accurately explain the definition of in loco parentis according to Ohio case law, we cannot find that the trial court abused its discretion by using the Ohio Jury Instructions rather than Knepley's requested instruction.

{¶13} Knepley's first assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED AS A MATTER OF LAW IN ALLOWING A FINDING THAT THE APPELLANT SHARED AN IN LOCO PARENTIS RELATIONSHIP WITH THE MINOR CHILD.**

---

[1] The 2011 Ohio Jury Instruction for in loco parentis is the same as the 2007 Jury Instruction for in loco parentis, the year the offense occurred.

{¶14} In his second assignment of error, Knepley argues the jury erred in finding he had an in loco parentis relationship with G.K. Knepley relies on *State v. White*, where the Second District Court of Appeals affirmed the trial court's ruling that the defendant did not have an in loco parentis relationship with the victim when he had only been the victim's stepfather for sixteen days, was unemployed, lived in the mother's home, and did not provide financial support for the mother or children. 116 Ohio App. 522, 189 N.E.2d 160 (1962). Knepley argues the jury should not have found he had an in loco parentis relationship with G.K., because even if they did find he lived with Schwenkmeyer and G.K., he only lived with them for fifteen days. Additionally, Knepley argues he was not married to Schwenkmeyer, so he had not taken on any parental obligations.

{¶15} Whether a person stands in loco parentis to a child is a question of fact. *State v. Caton*, 137 Ohio App.3d 742, 750, 739 N.E.2d 1176 (1st Dist. 2000). "It is well settled that an appellate court will not reverse a trial court's finding of fact based on insufficient evidence where the finding is supported by some competent, credible evidence." *Id*. The evidence must be viewed "in the light most favorable to the prosecution." *Id*., citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist. 1983).

{¶16} According to the Supreme Court of Ohio, in loco parentis means "'charged, factitiously, with a parent's rights, duties, and responsibilities.'"

*Noggle*, at 33, quoting Black's Law Dictionary 787 (6 Ed. 1990). As previously stated, a person stands in loco parentis to a child when he "has assumed the dominant parental role and is relied upon by the child for support." *Id.* The term applies to a person who has "put himself in the situation of a lawful parent assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption." *Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 736, 680 N.E.2d 161 (10th Dist. 1996).

{¶17} The State presented sufficient evidence to support the trial court's judgment that Knepley stood in loco parentis to G.K. First, the evidence presented at trial established that Knepley lived with Schwenkmeyer and G.K. Robin Thornton (hereinafter "Thornton"), Candlelite Apartments' office manager, testified that Knepley had signed a lease with Schwenkmeyer on July 30, 2007. (Feb. 15, 2011 Tr. at 1334); (Ex. 6). Thornton testified that Knepley could live at the apartment as long as Candlelite Apartments received the rent, even if the lease only listed one adult and one child. (Feb. 15, 2011 Tr. at 1340). Thornton believed Knepley did live at the apartment with Schwenkeyer. (*Id.* at 1335). Thus, Thornton provided competent, credible evidence that Knepley lived with Schwenkmeyer and G.K. prior to, and on the date of, G.K.'s death.

{¶18} The State also provided competent, credible evidence that Knepley cared for G.K. and provided financial support. During an interview with law

enforcement personnel, Knepley said he normally put G.K. to bed by rocking her to sleep and that he loved Schwenkmeyer and G.K. (Ex. 12). Knepley nodded in response to the officer's question of whether he lived with Schwenkmeyer. (*Id*.). Knepley further agreed that he shared the costs of rent, utilities, and food with Schwenkmeyer. (*Id*.).

{¶19} In addition to Knepley's own statements, Lisa Belcher, a friend of Schwenkmeyer's, testified that Knepley lived with Schwenkmeyer at Candlelite Apartments and that she saw him make bottles for G.K. (Feb. 14, 2011 Tr. at 1299-1301). Jill Critchet-Burdue, Schwenkmeyer's co-worker, testified that Knepley would check G.K.'s diaper and get juice for G.K. when she "walked up to him and held her cup to him." (Feb. 15, 2011 Tr. at 1428). Barron and Kathryn Beard (hereinafter "the Beards"), family friends of Knepley, testified that Knepley had stayed up with G.K. during the night before her death, giving her Orajel because she was teething. (*Id*. at 1345, 1358). The Beards further testified that Knepley would not permit G.K.'s biological father, Alvin Gerken (hereinafter "Gerken"), to visit G.K. (*Id*. at 1347-1348, 1357). Gerken corroborated the Beards' testimony regarding Knepley's refusal to let him visit G.K. when Knepley was present. (*Id*. at 1384-1385).

{¶20} Viewing this evidence in the light most favorable to the State, this evidence demonstrates that Knepley lived with Schwenkmeyer and G.K.; Knepley

provided financial support to Schwenkmeyer and G.K.; Knepley provided physical care for G.K. by putting her to bed, checking her diapers, and giving her bottles and juice; and that Knepley had enough control over G.K. to prevent her biological father from visiting her when Knepley was present. This case is clearly distinguishable from *White*, where the trial court did not find any evidence that the defendant provided support to the mother or her children. As a result, we find that this evidence is sufficient to support the jury's verdict determining that Knepley stood in loco parentis to G.K.

{¶21} Knepley's second assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. VIII

**THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S CRIMINAL RULE 29 MOTION TO DISMISS ALL OF THE CHARGES AT THE CONCLUSION OF THE STATE'S CASE IN CHIEF.**

{¶22} In his eighth assignment of error, Knepley contends that the State presented insufficient evidence to support his child endangering and involuntary manslaughter convictions. Knepley argues the trial court erred in failing to grant his Crim.R. 29 motion to dismiss the charges against him.

{¶23} Crim.R. 29(A) provides:

The court on motion of a defendant or on its own motion, after the

evidence on either side is closed, shall order the entry of a judgment

of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction for such offense or offenses.

"Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184, syllabus (1978).  This court has previously found that the *Bridgeman* standard "must be viewed in light of the sufficiency of evidence test * * *." *State v. Foster*, 3d Dist. No. 13-97-09, at *2 (Sept. 17. 1997).  When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1981), superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1991).

{¶24} Knepley was convicted of endangering children under R.C. 2919.22. A person violates this provision if he or she is a "person in loco parentis of a child under eighteen years of age" and creates "a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support." R.C. 2912.22.

The person is guilty of a felony if the violation results in "serious physical harm" to the child. R.C. 2919.22(E)(1)(d). Knepley was also convicted of involuntary manslaughter under R.C. 2903.04(A), which states, "[n]o person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony."

{¶25} We have already found the State presented sufficient evidence for a rational trier of fact to determine Knepley stood in loco parentis to G.K. The question remaining is whether the State presented sufficient evidence that Knepley violated his duty of care to G.K., causing her serious physical harm.

{¶26} Neither party disputes that G.K. was thirteen months old at the time of her death and clearly within the range of the child endangering offense. (Ex. 1). During the trial, the State introduced competent, credible evidence that Knepley violated his duty of care to G.K., causing her serious physical harm. Melvin Reinboldt (hereinafter "Reinboldt"), a friend of Knepley's, testified that Knepley had admitted giving G.K. Xanax and Oxycodone. (Feb. 16, 2011 Tr. at 1576-1578). Melvin testified that "it was basically driving [Knepley] nuts because he'd be left with the baby all the time, and he gave her some medicine to put her to sleep." (*Id.* at 1577). Reinboldt further testified that, "he told me he squashed them and put them in the bottle," referring to Oxycodone and Xanax. (*Id.*). Reinboldt testified that "[Knepley] said he had done it before and it * * * just put

the baby to sleep, so he [did] it again." (*Id*.). According to Reinboldt, Knepley said "[h]e might have [gone] overboard" on the night of G.K.'s death. (*Id*. at 1578).

{¶27} Additionally, the evidence demonstrated that before anyone knew the cause of G.K.'s death, Knepley asked two different family friends whether they thought the hospital would have the test results back before G.K.'s funeral if G.K. had died from drugs in her system. (Feb. 15, 2011 Tr. at 1431, 1476). Furthermore, Robert Forney testified that his toxicology department had run tests on G.K.'s blood and urine. (Feb. 16, 2011 Tr. at 1604). The test results showed that G.K. had consumed the Xanax within twelve hours of her death and the Oxycodone between two and ten hours before her death. (*Id*. at 1619). This time frame included the period when Knepley had stayed up with G.K. (Feb. 16, 2011 Tr. at 1535); (Feb. 14, 2011 Tr. at 1277). The test results further demonstrated that G.K. died from an overdose of Xanax and Oxycodone. (Feb. 16, 2011 Tr. at 1504-1510). Viewing this evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found that the elements of each of the offenses were met beyond a reasonable doubt.

{¶28} Knepley's eighth assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. V

**BY ALLOWING THE PROSECUTION TO ATTEMPT TO CONVICT TWO DEFENDANTS FOR THE SAME CRIME WHILE DENYING THE DEFENDANT'S ABILITY TO MENTION PREVIOUS STATEMENTS, THE TRIAL COURT DENIED THE DEFENDANT'S RIGHT TO DUE PROCESS UNDER BOTH THE UNITED STATES AND OHIO CONSTITUTION.**

{¶29} In his fifth assignment of error, Knepley argues the State used irreconcilable theories to prosecute Knepley and Schwenkmeyer for the same offense. Knepley contends the trial court violated his right to due process by excluding statements the State made during Schwenkmeyer's trial.

{¶30} Knepley relies on *Stumpf v. Houk*, a case from the Sixth Circuit Court of Appeals.[2] C.A. No. 01-3613, unreported (6th Cir. Aug. 11, 2011). In *Stumpf*, the prosecutor used the same evidence to prove each of the co-defendants was the principal offender and subject to the death penalty. *Id*. at 430-431. In one case, the prosecutor argued his main witness was reliable and the witness' testimony demonstrated that one of the co-defendants, Clyde Daniel Wesley, was the principal offender. *Id*. In the second case, the prosecutor argued the same witness was unreliable and the evidence proved that the other co-defendant, John David Stumpf, was the principal offender. *Id*. The Sixth Circuit took issue with the prosecutor's conduct, stating "[t]o allow a prosecutor to advance irreconcilable

---

[2] As a procedural matter, we note the opinion was vacated on October 26, 2011 after an en Banc rehearing.

theories without adequate explanation undermines confidence in the fairness and reliability of the trial and the punishment imposed and infringes upon the petitioner's rights." *Id*. at 437.

{¶31} In the present case, the State provides an adequate explanation for the prosecution of both Schwenkmeyer and Knepley, and offers a theory consistent with the outcome of the two cases. Schwenkmeyer was tried and convicted for G.K.'s death before the State was aware that Reinbolt had information regarding the case. As a result of this new evidence, the trial court granted Schwenkmeyer a new trial. The State then tried the case against Knepley based on the information it received from Reinbolt. Schwenkmeyer ultimately entered a guilty plea to reckless homicide after Knepley's trial. Unlike in *Stumpf*, the State did not attempt to use Reinbolt's testimony to convict both Schwenkmeyer and Knepley as the principal offenders of the same offense.

{¶32} Knepley's fifth assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED IN ALLOWING TESTIMONY OF A WITNESS WHO WAS NOT DISCLOSED TO THE DEFENDANT PRIOR TO TRIAL WHEN THE TESTIMONY OF THE WITNESS WAS HIGHLY PREJUDICIAL TO THE DEFENSE.**

{¶33} In his third assignment of error, Knepley argues the trial court abused its discretion by permitting the State to introduce testimony from Reinbolt when

-15-

the State had failed to disclose Reinbolt on the witness list. Knepley claims the State did not reveal that it would call Reinbolt as a witness until the second day of trial. Consequently, Knepley contends he was unfairly prejudiced because he did not have sufficient time to prepare his defense.

{¶34} Crim.R. 16 states, "[e]ach party shall provide to opposing counsel a written witness list, including names and addresses of any witness it intends to call in its case-in-chief, or reasonably anticipates calling in rebuttal or surrebuttal." The Supreme Court of Ohio has held a trial court does not abuse its discretion in permitting a witness to testify when a prosecutor has failed to provide the witness' name as required by Crim.R. 16 "where the record fails to disclose (1) a willful violation of the rule, (2) that foreknowledge would have benefited the accused in the preparation of his or her defense, or (3), that the accused was unfairly prejudiced." *State v. Scudder*, 71 Ohio St.3d 263, 269, 643 N.E.2d 524 (1994), citing *State v. Heinish*, 50 Ohio St.3d 231, 553 N.E.2d 1026, syllabus (1990).

{¶35} Knepley fails to demonstrate the trial court abused its discretion by permitting Reinbolt to testify. First of all, Knepley does not allege the State willfully violated Crim.R. 16. Secondly, there is ample evidence in the record that Knepley did have notice that the State intended to call Reinbolt as a witness. Reinbolt testified on February 16, 2011. (Tr. at 1563-1599). On February 3, 2011, Knepley filed a motion to permit defendant to impeach Melvin Reinbolt with his

pending indictment. (Doc. No. 400). The motion stated, "[a]t pretrial of this matter, the Court indicated a hesitancy to allow Defendant to question or otherwise impeach Melvin Reinbolt (a Henry County career felony criminal) as to his current pending indictment." (*Id.*). Based on his own motion, Knepley had notice the State intended to call Reinbolt prior to February 3, 2011 and was preparing to impeach him.

**{¶36}** At trial, Knepley admitted he had received Reinbolt's recorded phone conversation from the State in November. (Feb. 16, 2011 Tr. at 1572-1573). The record also reveals that the trial court held two hearings regarding Reinbolt's testimony prior to the trial. (*Id.*). Additionally, Knepley's counsel discussed Reinbolt's testimony during his opening statement on February 14, 2011. (Feb. 14 Tr. at 1214-1215). Thus, the record clearly demonstrates that Knepley knew the State anticipated calling Reinbolt as a witness prior to the second day of trial as Knepley contends, and that Knepley also knew the content of Reinbolt's anticipated testimony. Finally, Knepley had the opportunity to cross-examine Reinbolt at length regarding his criminal history and presented two witnesses, Penny Arps and Cherilynn Stott, to rebut Reinbolt's testimony. (Feb. 16, 2011 Tr. at 1582-1597); (Feb. 17, 2011 Tr. at 1674-1697). We cannot find that Knepley suffered undue prejudiced or that the trial court abused its discretion by admitting Reinbolt's testimony.

{¶37} Knepley's third assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. IV

**THE APPELLANT WAS DENIED A FAIR TRIAL WHEN CHARACTER EVIDENCE WAS ADMITTED THAT FAILED TO MEET ANY EXCEPTIONS THAT WOULD ALLOW SUCH AN ADMISSION.**

### ASSIGNMENT OF ERROR NO. VI

**THE TRIAL COURT ERRED TO THE DEFENDANT'S PREJUDICE WHEN IT ALLOWED THE ADMISSION OF EVIDENCE OBTAINED AS A RESULT OF A STALE SEARCH.**

### ASSIGNMENT OF ERROR NO. VII

**THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT ALLOWED IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE TO BE ADMITTED DURING TRIAL.**

{¶38} In his remaining assignments of error, Knepley contends the trial court erred by improperly admitting evidence. First, Knepley argues the trial court erred by admitting an aggravated menacing complaint and resulting telephone harassment conviction because the complaint and conviction are character evidence that do not fall under any exception. Second, Knepley argues the trial court erred when it admitted evidence obtained from a search of the apartment on November 9, 2007 because the search was stale, occurring nearly three months after G.K.'s death. Finally, Knepley argues the trial court erred when it admitted

evidence of the medications Knepley took other than Xanax and Oxycodone because such evidence was irrelevant and highly prejudicial.

{¶39} A trial court has discretion to determine whether to admit or exclude evidence. *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 66, 567 N.E.2d 1291 (1991). As such, we will not disturb the trial court's decision on that issue unless the trial court abused its discretion. *Id*. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶40} Generally, evidence of other crimes, wrongs, or acts is inadmissible to prove character or show the defendant acted in conformity therewith. Evid.R. 404(B). However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. *Id*.

{¶41} In this case, the trial court admitted evidence of Knepley's aggravated menacing charge and final telephone harassment conviction to show Knepley's intention to create an in loco parentis relationship with G.K. Gerken testified that Knepley continually called, harassed, and threatened him and Schwenkmeyer when Gerken was with Schwenkmeyer. (Feb. 15, 2011 Tr. at 1381-1382). The State offered this evidence, combined with Knepley's refusal to permit Gerken to visit G.K., to demonstrate that Knepley intended to have an in

loco parentis relationship with G.K. and did not want Gerken to have contact with Schwenkmeyer or G.K. Consequently, the evidence was not offered as character evidence, but to prove an element of the offense. However, even if the evidence was character evidence, it shows Knepley's intent to create an in loco parentis relationship with G.K., thus meeting an exception of Evid.R. 404(B). We cannot find that the trial court abused its discretion by admitting Knepley's aggravated menacing charge and final telephone harassment conviction.

{¶42} Knepley further contends the trial court erred by admitting evidence from a November 9, 2007 search of the apartment. Knepley argues the search was stale and any resulting evidence inadmissible.

{¶43} On March 10, 2009, Knepley filed a motion in limine requesting that the trial court suppress evidence from the November 9, 2007 search. (Doc. No. 77). The trial court granted Knepley's motion, in part, ruling that the State could only admit evidence of "the pill bottles for [X]anax and/or [O]xycodone with a date filled prior to August 15, 2007." (Doc. No. 215). The trial court explicitly ruled the State could not admit evidence of any medications or drugs with dates on or after August 15, 2007, the date of G.K.'s death. (*Id.*). Furthermore, after reviewing the trial transcripts, we cannot find that the State introduced any evidence of medications dated after August 15, 2007 in violation of the trial court's order. In fact, it was Knepley, not the State, that introduced evidence of

straws and Oxycodone found under Schwenkmeyer's bed during the November 9, 2007 search. (Feb. 16, 2011 Tr. at 1551-1553). Since the trial court limited the evidence that the State could admit from the search to those medications filled prior to August 15, 2007, we cannot find that the trial court erred.

{¶44} Finally, Knepley argues the trial court erred by admitting evidence of medications he used other than Oxycodone and Xanax because such evidence was irrelevant and highly prejudicial.

{¶45} Generally, relevant evidence is admissible. Evid.R. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. However, relevant evidence is inadmissible where "its probative value is outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403.

{¶46} During the course of his interview with law enforcement personnel, Knepley answered questions regarding his prescription medications. (Ex. 12). Knepley listed the medications he took, which included Oxycodone, Trazodone, Elavil, Xanax, and Methadone. (*Id*.). Knepley further explained the reason why he took each medication, including back pain, pain relief, anxiety, and sleep aids. (*Id*.). Knepley told the officer he kept all of his medications in a pill box. (*Id*.). The State introduced this evidence to prove G.K. did not accidentally consume

-21-

Oxycodone and Xanax because it is unlikely she would have consumed only those two drugs when all five were kept in the pill box together. Rather, the evidence tended to show that Knepley administered the Oxycodone and Xanax to G.K., consistent with his admission to Reinbolt. The evidence of Knepley's medications was highly relevant because it demonstrated Knepley had the requisite mental state for the endangering children and involuntary manslaughter charges. Additionally, we cannot find that the probative value of the evidence was outweighed by the danger of unfair prejudice since the State presented evidence of the purpose for each medication and that Knepley did have valid prescriptions for each one. Consequently, the trial court did not abuse its discretion by admitting evidence regarding the medications Knepley used at the time of G.K.'s death.

{¶47} Knepley's fourth, sixth, and seventh assignments of error are, therefore, overruled.

{¶48} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW and WILLAMOWSKI, J.J., concur.**

**/jlr**