[Cite as *State v. Hinojosa*, 2013-Ohio-4110.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO. 13-12-41

    v.

CHRISTAL A. HINOJOSA,            O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 11 CR 0291

Judgment Affirmed

Date of Decision:   September 23, 2013

APPEARANCES:

    *Jonathan G. Stotzer* for Appellant

    *Derek W. DeVine and Rhonda L. Best* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Christal A. Hinojosa ("Hinojosa"), appeals the September 13, 2012 judgment of the Seneca County Court of Common Pleas journalizing her conviction by a jury for one count of child endangerment resulting in serious physical harm to the child, in violation of R.C. 2919.22(A), (E)(2)(c), and one count of permitting child abuse, in violation of R.C. 2903.15(A), and sentencing her to serve thirty-six months in prison.

{¶2} In December of 2010, Hinojosa had custody of K.M. (born September 2008). K.M.'s father lived in Georgia, where he was employed as a member of the military. On December 17, 2010, Hinojosa and her two minor children, K.M. and A.H. (born April 2010), moved into a home in Fostoria, Ohio, with Hinojosa's boyfriend, Dave Roberts ("Roberts"). Roberts' minor son also lived in the home on a part-time basis. Between December 2010 and February 2011, family members and friends began observing suspicious bruising on K.M.'s body. The following testimony was adduced at trial regarding the nature of these injuries.

*December 2010*

{¶3} Kelly Stephens, Hinojosa's aunt, testified that she first noticed something strange with K.M. during Christmas 2010 when she observed him wince in pain as his grandmother picked him up. She saw K.M.'s grandmother lift his shirt to reveal a huge bruise on his lower back. Kelly asked Hinojosa how

K.M. received this bruise and she responded that Roberts told her that K.M. fell down the stairs while she was at work.

*January 2011*

{¶4} Deb Puffenberger, Hinojosa's grandmother, testified that she first noticed bruising on K.M. in the early part of January 2011 when she saw a large black and blue bruise on K.M.'s tailbone. When she asked Hinojosa about the bruise, Hinojosa responded that Roberts told her that K.M. fell down the stairs while she was at work. Deb testified that Hinojosa and her children lived with her prior to moving in with Roberts and she never noticed K.M. to have strange bruising or trouble with the stairs.

{¶5} April Robbins, a family friend, testified that she has known K.M. since his birth and saw him often. April explained that Hinojosa would let her "have" K.M. and his sister for days or weeks at a time and that Hinojosa would simply contact her every couple days to see how the children were doing. April recalled that after K.M. began living with Roberts, he would cry when she dropped him off at home. April testified that K.M. did not want to be at the home he shared with Roberts.

{¶6} On the stand, April recalled the last time she saw K.M. On January 15, 2011, Hinojosa dropped K.M. off to spend time with April and her family at April's parent's home. April explained that she was not at home at the time, but

received a phone call from her parents telling her she needed to come home immediately. April's sister, Ashley, had just given K.M. a bath and noticed extensive bruising all over K.M.'s body. Ashley testified at trial that these bruises were all down K.M.'s back and in "random" places on his body. Ashley stated that she had never seen bruising like this on K.M.

{¶7} April recalled that when she returned home that night Ashley and her father pulled her into the kitchen and lifted up K.M.'s shirt. April testified that she observed bruises all down his back, under his bottom, down his legs and on his upper arms. April stated that some of the bruises were new and some were older. She had never seen bruising like this on K.M. The extensive bruising on K.M. prompted April's father to contact the Fostoria Police Department and take K.M. to the police station.

{¶8} At the police station, Officer Brandon Bell examined K.M. and observed bruising all over his body, including on his face, back, and chest. Officer Bell took several pictures of K.M.'s body, which depicted numerous bruises in various stages of healing. Officer Bell wrote a complaint and contacted the Seneca County Department of Job and Family Services ("SCDJFS"). No arrests were made or charges filed as a result of this incident. The record indicates that SCDJFS conducted an initial investigation but then closed the case, finding any

allegations of abuse to be unsubstantiated.  K.M. returned home with April and her family from the police station.

**{¶9}** After the incident, Hinojosa told April that K.M. received the bruises from falling down and rough playing with Roberts' son.  However, April recalled that it was not typical of K.M. to play rough and that the bruises, especially the ones on his back, did not seem consistent with falling down.  Hinojosa no longer permitted April to have contact with K.M. once she learned that April took K.M. to the police station.

*February 2011*

**{¶10}** On February 15, 2011, Deb Puffenberger, Hinojosa's grandmother, babysat K.M. while Hinojosa ran an errand.  At that time, Deb noticed bruising on K.M.'s face.  She also recalled that K.M. could barely stand up and appeared to be walking with a limp.  After Hinojosa returned, Deb went to the home of her daughter, Kelly Stephens.  Kelly testified that she also recalled seeing K.M. walk with a limp during this time.  Deb testified that she was very upset about K.M.'s physical state and worried about his safety.

**{¶11}** Deb contacted the Fostoria Police Department and met with Officer Shilo Frankart to fill out a police report.  Kelly was with Deb at the police station and recalled that Deb was so upset and nervous that she could not complete the report.  As a result, Deb dictated what she observed to Kelly, who filled out the

report. Officer Frankart asked Deb to bring K.M. to the police station so that he could observe and document K.M.'s injuries in a controlled environment. Deb testified that she went to Hinojosa and Roberts' home to retrieve K.M. while Hinojosa was at work. However, Roberts would not let her have K.M. Deb recalled that Roberts told her to leave the residence and slammed the door in her face. Deb then went to Kelly's home and Kelly contacted K.M.'s paternal grandparents.

{¶12} When Deb was unable to bring K.M. to the police station, Officer Frankart then went to Hinojosa and Roberts' home to investigate. Officer Frankart arrived at the home and was greeted by Roberts. Hinojosa was not home during this visit. Officer Frankart advised Roberts of the child abuse allegations and asked to come in. There, he observed three children in the home, K.M., A.H. and Roberts' two-year-old son. Officer Frankart noticed "severe" bruising on K.M's face, neck, and back. Specifically, he recalled seeing approximately twenty bruises on K.M.'s body. He inquired to Roberts about the bruises, who stated that some of the bruises were caused by K.M. falling down the stairs and some were caused by K.M. falling out of a booster seat and hitting his face on the kitchen table.

{¶13} Officer Frankart recalled seeing finger marks along K.M.'s face. He asked Roberts specifically about these marks. Roberts then admitted to slapping

K.M.  Roberts explained that K.M. bit him as he was wiping K.M.'s face.  Roberts claimed he slapped K.M. as a reflex and was very apologetic about the incident.  Other than the bruising, Officer Frankart did not observe a limp or any other injury.  He recalled that K.M. was alert and behaving normally.  He advised Roberts of his concerns about the bruising.  Officer Frankart then left the home and contacted a caseworker at the SCDJFS, who indicated that an investigation was underway.

{¶14} Later that day, Officer Frankart received a call regarding a disturbance at Hinojosa and Roberts' home.  When Officer Frankart arrived at the home, he observed K.M.'s paternal grandparents attempting to remove K.M. from the residence.  During this time, Officer Frankart learned that K.M.'s paternal grandparents had previously filed a police report in their hometown of Fremont, Ohio, regarding bruising they found on K.M. during a visitation.  K.M.'s paternal grandparents expressed that they were extremely concerned about K.M.'s well-being living with Roberts.

{¶15} At this time, Hinojosa was now at the home.  Officer Frankart testified that he did not observe any new injuries on K.M.  However, he advised Hinojosa to take K.M. to the hospital for a physical examination to alleviate any family concerns about abuse.  Hinojosa took K.M. to the Fostoria Community Hospital, where a medical examination was performed.  There, Officer Frankart

took several pictures of K.M.'s body, which depicted numerous bruises, some severe, all over his face, neck, and body.

{¶16} Jennifer Hartson, an R.N. assigned to the emergency room at the Fostoria Community Hospital, testified that she treated K.M. on February 15, 2011, and documented 28 different bruises on his body of various sizes and in different stages of healing. She recalled Hinojosa explaining that some of the bruises on his face occurred from him falling off a chair onto the hardwood floor and being slapped by Roberts. However, when asked about several of the other bruises, Hinojosa responded that she did not know how they occurred. Nurse Hartson testified that an X-ray revealed K.M. had a broken clavicle that was in the process of healing. After a couple of hours, K.M. was treated and released. He spent a few days with Deb before returning home with Hinojosa, who continued to live with Roberts.

{¶17} Kelly testified that she continued to see new bruises on K.M. every time she saw him. She explained that when she asked Hinojosa about the injuries Hinojosa would simply repeat the same explanations given to her by Roberts about falling down the stairs, falling out of the booster seat, and rough playing with Roberts' son. Kelly testified that all of these injuries happened when Hinojosa was at work and K.M. was in Roberts' care. Kelly recalled that Hinojosa became very defensive when asked about K.M.'s well-being in the home and she insisted

that family members were out of line for telling her how to raise her children. When confronted about Roberts' role in the injuries, Hinojosa denied that Roberts would do anything to hurt K.M.

{¶18} Deb testified that she also continued to notice strange bruising on K.M. Deb expressed concern about the injuries to Hinojosa, in particular she found it alarming that the injuries consistently occurred when Hinojosa was not at home. However, Hinojosa retorted that she did not find Roberts' explanations of the injuries suspicious and became increasingly defensive. Deb recalled explicitly telling Hinojosa that she believed Roberts was abusing K.M. Deb testified that Hinojosa became angry and told Deb to leave her home and never return.

{¶19} On February 28, 2011, while Hinojosa was at work, Roberts called 9-1-1 and reported K.M. to be unresponsive. K.M. was transported to the Fostoria Community Hospital by ambulance. The medical testimony at trial indicated that K.M. was limp and unable to breathe on his own. Due to his critical condition, K.M. was life-flighted to the Toledo Children's Hospital. There, medical personnel determined K.M. to be suffering from a brain injury—specifically a subdural hematoma and retinal hemorrhaging, both of which are indicators of shaken baby syndrome. According to the testimony elicited at trial, Roberts was the last person to be with K.M. before he suddenly collapsed. Roberts' explanation was that he was playing with K.M. and his sister by throwing them on

the mattress when K.M. expressed that he was tired and entered his bedroom to put on his pajamas. Roberts claimed that as K.M. pulled the shirt over his head, he observed K.M.'s eyes roll back into his head and then he collapsed.

{¶20} However, Roberts' explanation of the injury was inconsistent with the testimony of medical personnel who determined the cause of K.M.'s brain injury to be non-accidental or abusive trauma. Specifically, Dr. Randall Schlievert, one of K.M.'s treating physicians and a child abuse expert, testified that an injury such as K.M.'s is caused by one of two things or a combination: (1) an isolated severe shaking event or (2) an isolated severe impact—i.e., where the head is struck with an object or slammed into something. Dr. Schlievert explained that this injury is caused by the brain essentially moving at a differential rotation in the skull. Dr. Schlievert testified that K.M.'s collapse and unresponsiveness was an *immediate* reaction to the trauma causing his brain to rotate inside his skull. Dr. Schlievert further testified that rough play or being thrown on a mattress could not have caused K.M.'s injury. Several medical personnel testified that in their expert opinions the bruising, the broken clavicle, and the traumatic brain injury all suggested that K.M. was exposed to a pattern of repeated abuse.

{¶21} Upon his release from the hospital, K.M. was placed with Deb through the Seneca County Juvenile Court. Deb testified that K.M. suffered from

blindness, and paralysis on one side. She also recalled that K.M. could not walk or feed himself and described him as an "infant" again.

{¶22} On March 9, 2011, K.M. was hospitalized for 21 days after having a seizure at Deb's home. K.M. underwent brain surgery to relieve pressure on his brain, which was also causing his eyes to turn inward. The pressure was caused by the subdural hematoma. The surgery involved drilling holes in K.M.'s skull to release excess fluid and to prevent permanent neurological damage. Deb recalled that after the surgery K.M. was able to see again, but he still had to go through intensive rehabilitation to learn how to walk.

{¶23} Despite the conclusions of the medical professionals regarding K.M. being repeatedly abused, Hinojosa continued to live with Roberts, who eventually fathered her third child (born in December 2011). In May of 2011, K.M. was adjudicated as an abused child. In August of 2011, K.M.'s father gained custody of him and K.M. moved to Georgia. According to the record, K.M. still has trouble walking and requires the use of braces on his legs.

{¶24} On December 28, 2011, Hinojosa was indicted on one count of child endangerment resulting in serious physical harm to the child, in violation of R.C. 2919.22(A), (E)(2)(c), and one count of permitting child abuse, in violation of R.C. 2903.15(A). The case proceeded to a three-day jury trial, where the jury

heard the testimony of 19 witnesses, including Hinojosa. The jury subsequently returned verdicts of guilty on both counts.

{¶25} On September 12, 2012, the trial court held a sentencing hearing, where several family members spoke on K.M.'s behalf. The trial court determined that the offenses were allied offenses of similar import and the prosecution elected to proceed on the child endangerment conviction. The trial court sentenced Hinojosa to serve the maximum sentence of thirty-six months in prison.

{¶26} Hinojosa now appeals asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. I**
**THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING APPELLANT TO THE MAXIMUM POSSIBLE PENALTY.**

**ASSIGNMENT OF ERROR NO. II**
**THE VERDICTS OF GUILTY TO ENDANGERING CHILDREN AND PERMITTING CHILD ABUSE MADE BY THE JURY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED.**

{¶27} For ease of discussion, we elect to discuss Hinojosa's assignments of error out of order.

*Second Assignment of Error*

{¶28} In her second assignment of error, Hinojosa argues that the jury verdicts convicting her child endangering and permitting child abuse are against the manifest weight of the evidence.

**{¶29}** In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, " '[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶30}** Hinojosa was convicted of child endangerment, in violation of R.C. 2919.22 (A), (E)(2)(c), which states in pertinent part:

> **No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support[.]**
>
> **\* \* \***
>
> **If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, [the offense is] a felony of the third degree[.]**

**{¶31}** Hinojosa was also convicted of permitting child abuse, in violation of

R.C. 2903.15(A), which states in pertinent part:

> **No parent, guardian, custodian, or person having custody of a child under eighteen years of age or of a mentally or physically handicapped child under twenty-one years of age shall cause serious physical harm to the child, or the death of the child, as a proximate result of permitting the child to be abused, to be tortured, to be administered corporal punishment or other physical disciplinary measure, or to be physically restrained in a cruel manner or for a prolonged period.**

**{¶32}** Even though Hinojosa does not articulate her manifest weight argument in the terms of the specific elements of the offenses, it is apparent that Hinojosa is taking issue with the jury finding that she created a substantial risk to the health or safety of K.M., by violating her duty of protection, and that she permitted K.M. to be abused.

**{¶33}** With regard to the child endangerment conviction, the Supreme Court of Ohio as held that "[i]t is not necessary to show an actual instance or pattern of physical abuse on the part of the accused in order to justify a conviction under R.C. 2919.22(A)." *State v. Kamel*, 12 Ohio St.3d 306, 308 (1984). Rather is sufficient to show "an inexcusable failure to act in discharge of one's duty to protect a child where such failure to act results in a substantial risk to the child's health or safety is an offense under R.C. 2919.22(A)." *Id*. A " '[s]ubstantial risk' means a strong possibility, as contrasted with a remote or significant possibility,

that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

**{¶34}** Furthermore, R.C. 2919.22(A) requires proof of a culpable mental state of recklessness as an essential element of the crime of endangering children. *State v. McGee*, 79 Ohio St.3d 193, 195 (1997). A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. R.C. 2901.22(C). "The crime of felony child endangering under R.C. 2919.22(A) may be committed by omission: where a child suffers serious physical harm as a result of a parent or guardian "recklessly" failing to protect the child from a substantial risk of harm, the parent or guardian is guilty of child endangering." *State v. Elliott*, 104 Ohio App. 3d 812, 817-18 (10th Dist.1995) citing *State v. Kamel*, 12 Ohio St.3d 306, 309 (1984).

**{¶35}** On appeal, Hinojosa argues that prior to K.M. suffering his life-threatening brain injury on February 28, 2011, she did not know that K.M. was being abused. In support of her position, Hinojosa points to the fact that neither law enforcement nor children protective services upon conducting their investigations concluded that immediate removal of K.M. from her home was warranted. Hinojosa claims that this coupled with Roberts' seemingly innocuous explanations for how K.M.'s injuries occurred in her absence demonstrates there

was not a strong possibility that K.M. was being abused. However, at trial, testimony from both law enforcement officers and children services caseworkers indicated that it was not typical protocol to immediately remove a child unless there is an apparent life threatening situation and that at the time of their investigations K.M.'s situation did not seem to meet this criterion.

**{¶36}** Notwithstanding this fact, Hinojosa gives no credibility to the ample testimony of her friends and family members—the people closest K.M. and most knowledgeable about changes in his daily well-being—who continued to express concern and questioned the increasing severity and frequency of K.M.'s injuries. The testimony at trial revealed that these people were so alarmed upon viewing the extensive bruising on K.M.'s body that they felt *compelled* to report the possibility that K.M. was being abused to the authorities. In fact, the record establishes that in the months leading up to K.M.'s life threatening brain injury there were three isolated instances in which either a friend or a family member independently contacted law enforcement with concerns that K.M. was being abused. Many of these people specifically suspected Roberts to be K.M.'s abuser. Nevertheless, the record is replete with examples of Hinojosa's willful blindness and heedless indifference to the strong possibility that her son was being repeatedly abused.

**{¶37}** Aside from the numerous red flags raised by friends and family members to Hinojosa regarding the strong possibility that K.M. was being abused,

the medical evidence documented on February 15, 2011, two weeks before K.M. suffered his near fatal injury, independently confirmed that K.M. was likely being abused. Specifically, during the physical evaluation at the hospital it was revealed that K.M. had a healing broken clavicle, in addition to the 28 bruises in various stages of healing. The testimony of medical experts at trial established that these both are indicators of a pattern of ongoing abuse. However, the record demonstrates Hinojosa chose to ignore all the warning signs that someone with daily access to K.M. was abusing him, and instead chose to continue to live with Roberts and leave K.M. in Roberts' care while she was at work.

{¶38} Based on the extensive testimony and medical records presented at trial, we find that the evidence supports a determination by the jury that Hinojosa's actions of putting her personal relationship with Roberts before her own child's well-being constituted an inexcusable failure to act in discharge of her duty to protect K.M. and that her failure to act resulted in K.M. suffering serious physical harm. Likewise, we also find that the evidence supports a determination by the jury that Hinojosa, by her inaction, caused serious physical harm to K.M. as a proximate result of her permitting K.M. to be abused. Accordingly, we are not persuaded by Hinojosa's arguments on appeal that the jury lost its way and created a manifest miscarriage of justice. We therefore find that Hinojosa's convictions

are not against the manifest weight of the evidence. The second assignment of error is overruled.

*First Assignment of Error*

**{¶39}** In her first assignment of error, Hinojosa argues that the trial court erred when it sentenced her to the maximum sentence of thirty-six months.

**{¶40}** An appellate court must conduct a meaningful review of the trial court's sentencing decision. *State v. Daughenbaugh*, 3d Dist. No. 16–07–07, 2007–Ohio–5774, ¶ 8, citing *State v. Carter*, 11th Dist. No.2003–P–0007, 2004–Ohio–1181. In particular, R.C. 2953.08(G)(2) provides the following regarding an appellate court's review of a sentence on appeal.

> **The court hearing an appeal * * * shall review the record, including the findings underlying the sentence or modification given by the sentencing court.**
>
> **The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:**
>
> **(a)   That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;**
>
> **(b)   That the sentence is otherwise contrary to law.**

{¶41} Furthermore, a sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing, which are to protect the public from future crimes by the offender and others and to punish the offender, and shall be commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders. *See* R.C. 2929.11(A),(B).

{¶42} Hinojosa does not dispute that the thirty-six month sentence falls within the permissible statutory range for third degree felonies. R.C. 2929.14(A)(3). Instead, Hinojosa argues that the trial court improperly considered the factors in R.C. 2929.11 and 2929.12. Hinojosa contends that the maximum sentence is improper in light of the fact that she has no prior criminal record and argues that her recidivism is unlikely to occur.

{¶43} On appeal, consistent with her statements at trial, Hinojosa also makes a revealing argument attempting to lessen the severity of her conduct by characterizing the actions leading to her conviction for child endangerment as simply "trusting the wrong person and expecting too much proof from others before acting herself." (Appt. Brief at 11-12). This argument only highlights Hinojosa's continued lack of accountability for her inexcusable failure to act in discharge of her duty to protect her child from the hands of an abuser. Notably,

the record demonstrates that Hinojosa continued to live with Roberts, even after she finally acknowledged that he was responsible for K.M.'s near fatal brain injury.

**{¶44}** At sentencing, the prosecution presented evidence demonstrating that, even after sitting through a three-day trial where the injuries her son suffered as a result of being abused were repeatedly described in painstaking detail, Hinojosa continued to place phone calls to Roberts from jail to express her love for him. Thus, Hinojosa has demonstrated that she learned nothing from the experience of her son nearly dying because of her conduct. Moreover, one of the factors the trial court must consider in sentencing is the protection of the public from future crimes by the offender. While Hinojosa's chances of recidivism with respect to K.M. may be lessened, Hinojosa still has two other children—one fathered by Roberts—both of whom need to be protected from being subjected to similar abuse as result of Hinojosa's unwillingness to fulfill her duty as a mother and protect her children from serious physical harm.

**{¶45}** Based on the above, we find that the trial court properly considered all of the appropriate statutory factors. Therefore, we also find that the record supports the trial court's conclusion that the imposition of the maximum sentence is necessary in order to punish Hinojosa and to protect the public. Hinojosa's first assignment of error is overruled.

{¶46} For all these reasons, the conviction and sentence of the Seneca County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**WILLAMOWSKI and ROGERS, J.J, concur.**

**/jlr**