[Cite as *State v. Miller*, 2014-Ohio-261.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO. 13-13-14

      v.

RODNEY A. MILLER, JR.,               O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Seneca County Common Pleas Court
Trial Court No. 12-CR-0112

Judgment Affirmed

Date of Decision:  January 27, 2014

APPEARANCES:

    *Susan J. Phillips* for Appellant

    *Brian O. Boos* for Appellee

Case No. 13-13-14

**PRESTON, J.**

{¶1} Defendant-appellant, Rodney A. Miller, Jr. ("Miller"), appeals the Seneca County Court of Common Pleas' judgment entry of conviction and sentence. For the reasons that follow, we affirm.

{¶2} This case stems from injuries sustained by a three-month-old infant boy, K.B. After K.B.'s pediatrician noticed during an appointment that his pupils were lowered and his anterior fontanelle[1] was bulging, she ordered a CAT scan and then sent him to St. Vincent Hospital in Toledo, Ohio, where he was admitted as a patient. (Mar. 13-14, 2013 Tr., Vol. One, at 120-123). From St. Vincent Hospital, K.B. was transported to the pediatric intensive care unit at Rainbow Babies & Children's Hospital ("Rainbow Hospital") in Cleveland, Ohio. (Mar. 13-14, 2013 Tr., Vol. Two, at 279). Authorities from the Tiffin Police Department and the Ohio Bureau of Criminal Investigation investigated. (Mar. 13-14, 2013 Tr., Vol. One, at 134-135).

{¶3} On June 20, 2012, the Seneca County Grand Jury indicted Miller on one count of endangering children in violation of R.C. 2919.22(A), (E)(2)(c), a third-degree felony. (Doc. No. 1).

---

[1] The anterior fontanelle, also known as the anterior fontanel, is, "[i]n the fetus and in a young infant, a soft spot in the front part of the top of the head, situated at the junction of the sagittal suture (a bony seam which extends from the front of the cranium to the back) and the coronal suture (another bony seam extending from side to side in the front part of the cranium)." 2 J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, F-144 (2004).

{¶4} The trial court held an arraignment hearing on June 27, 2012. (June 27, 2012 Tr. at 2). Miller appeared with his court-appointed counsel, was arraigned, and entered a plea of not guilty. (*Id.* at 2-7); (Doc. No. 11).

{¶5} On March 13 and 14, 2013—after a series of motions, hearings, judgment entries, and continuances—a jury trial was held on the indictment, and the jury found Miller guilty. (Mar. 14, 2013 Verdict Tr. at 2-3); (Doc. No. 67). The jury further found "that the offense did not result in serious physical harm to the child." (*Id.*); (*Id.*).

{¶6} The trial court held a sentencing hearing on April 12, 2013. (Apr. 12, 2013 Tr. at 2); (Doc. No. 72). The trial court found that a jury convicted Miller of the charge of child endangering in violation of R.C. 2919.22(A), (E)(2)(c), a first-degree misdemeanor.[2] The trial court concluded that the offense represented one of the worst forms of the offense and sentenced Miller to 180 days in the Seneca County Jail. (*Id.* at 9); (*Id.*). The trial court also ordered that Miller pay all costs of prosecution, court-appointed counsel costs, and any fees permitted under R.C.

---

[2] The jury found Miller guilty of endangering children in violation of R.C. 2919.22(A), (E)(2)(c) but further found "that the offense did not result in serious physical harm to the child." By making that further finding, the jury found Miller guilty of endangering children in violation of R.C. 2919.22(A), (E)(2)(a), a first-degree misdemeanor and lesser included offense of the originally charged R.C. 2919.22(A), (E)(2)(c). Indeed, the trial court stated that the jury found Miller guilty of a first-degree misdemeanor and sentenced him for a first-degree misdemeanor, but it cited R.C. 2919.22(A), (E)(2)(c)—the third-degree felony subsection. (*See* Apr. 12, 2013 Tr. at 9); (Doc. No. 72). Miller assigns no error related to the incorrect statutory citation, and the proper statutory section may be reflected in the trial court's judgment entry of conviction and sentence via a nunc pro tunc entry. *See State v. Vance*, 9th Dist. Lorain No. 94CA005785, 1994 WL 543121, *1 (Oct. 5, 1994), citing Crim.R. 36.

2929.18(A)(4). (*Id.*); (*Id.*). The trial court filed its judgment entry of conviction and sentence on April 15, 2013.[3] (Doc. No. 72).

{¶7} On April 24, 2013, Miller filed a notice of appeal. (Doc. No. 76). He raises two assignments of error for our review.

**Assignment of Error No. I**

**The conviction of Appellant was against the manifest weight of the evidence.**

{¶8} In his first assignment of error, Miller argues that his endangering-children conviction was against the manifest weight of the evidence. He argues that there was no credible evidence presented that Miller caused K.B.'s injuries. In particular, Miller argues that the authorities jumped to the conclusion that Miller caused K.B.'s injuries and neglected to thoroughly investigate the other four adults who resided in the home where K.B. lived. Miller also argues that his "bizarre and unconventional" methods to get K.B. to stop crying did not lead to K.B.'s admission into Rainbow Hospital.

{¶9} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and

---

[3] Miller moved to stay the sentencing judgment but later withdrew his motion after the trial court granted him a one-month medical furlough. (Doc. Nos. 73, 74, 89); (May 23, 2013 Tr. at 2). Nevertheless, it is unclear from the record and the appearance docket whether Miller has served his sentence and, if so, whether he served it voluntarily. Nor is it clear whether Miller has paid the costs and fees imposed as part of his sentence. Therefore, we do not find this appeal to be moot. *See State v. Wolford*, 3d Dist. Union No. 14-07-10, 2007-Ohio-6428, ¶ 10-11.

determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶10} The criminal offense of endangering children is found in R.C. 2919.22 and provides, in relevant part:

(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.

If a violation of R.C. 2919.22(A) "results in serious physical harm to the child involved," the offense is a third-degree felony. R.C. 2919.22(E)(2)(c). If the violation of R.C. 2919.22(A) does not result in serious physical harm to the child involved, and if none of the other factors of R.C. 2919.22(E)(2)(b) or (d) are present, the offense is a first-degree misdemeanor. R.C. 2919.22(E)(2)(a).

**{¶11}** "To find the defendant guilty of child endangering under [R.C. 2919.22(A)], the state must prove beyond a reasonable doubt that the defendant: (1) was the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen; (2) violated a duty to said child; (3) created a substantial risk to the health or safety of the child; and (4) acted recklessly." *State v. Miller*, 3d Dist. Logan Nos. 8-07-07 and 8-07-08, 2007-Ohio-6711, ¶ 12, citing R.C. 2919.22(A) and *State v. McGee*, 79 Ohio St.3d 193, 195 (1997).

**{¶12}** At trial, the State offered four witnesses, including Dr. Romena Moorjani, K.B.'s pediatrician.[4] (Mar. 13-14, 2013 Tr., Vol. One, at 118-119). She testified that three-month-old K.B. had an appointment on March 1, 2012 for some nasal congestion and coughing following his bronchiolitis diagnosis two weeks before. (Mar. 13-14, 2013 Tr., Vol. One, at 118-120, 126). At K.B.'s appointment—to which his mother, Stephanie Wickham, brought him—Dr.

---

[4] The trial court qualified Dr. Moorjani as an expert witness regarding medical diagnosis and treatment. (Mar. 13-14, 2013 Tr., Vol. One, at 119).

Moorjani noticed that K.B.'s pupils were lowered and his anterior fontanelle was bulging. (*Id.* at 120-121). Based on her examination, Dr. Moorjani ordered a CAT scan be done that day and, after reviewing the results of the CAT scan the following day, referred K.B. to St. Vincent Hospital in Toledo, Ohio for a neurological consult and further management. (*Id.* at 121-122). K.B. was transported by ambulance to St. Vincent Hospital and admitted as a patient. (*Id.* at 122-123). Shortly after Dr. Moorjani referred K.B. to St. Vincent Hospital, Special Agent David Pauly interviewed her. (*Id.* at 123).

{¶13} On cross-examination, Dr. Moorjani testified that she saw K.B. approximately five times up to and including the appointment on March 1, 2012. (*Id.* at 123-125). She testified that when she ordered the CAT scan, she had no suspicions that K.B.'s condition may have been the result of child abuse. (*Id.* at 127). Nor had she noticed any developmental problems with K.B. prior to March 1, 2012. (*Id.*). Dr. Moorjani testified that she referred K.B. to St. Vincent Hospital for clinical correlation after learning that the radiologist interpreting the results of K.B.'s CAT scan could not discern whether K.B. was suffering from fluid accumulation, bleeding, or a cortical infarct, a stroke-like condition. (*Id.* at 128). Dr. Moorjani did not believe K.B. suffered a stroke. (*Id.* at 129).

{¶14} On March 1, 2012, Dr. Moorjani examined K.B. head to toe. (*Id.*). The state of K.B.'s eyes led her to believe K.B. might be suffering from

-7-

hydrocephalus—fluid accumulation in the head. (*Id.* at 129-130). Dr. Moorjani admitted that she did not see any bruising on K.B., nor did she notice any cracked ribs. (*Id.* at 130). Dr. Moorjani also testified that when she observed Wickham with K.B., Wickham treated K.B. appropriately. (*Id.* at 130-131).

{¶15} Special Agent David Pauly of the Ohio Bureau of Criminal Investigation, Special Investigations Unit, Crimes Against Children Section, also testified at trial. (*Id.* at 132-134). He initiated an investigation into K.B.'s case at the request of the Tiffin Police Department. (*Id.* at 135). Special Agent Pauly and Detective David Horn of the Tiffin Police Department learned that K.B. had been transferred from St. Vincent Hospital to Rainbow Hospital, so they went there on March 5, 2012. (*Id.* at 136). They spoke with medical personnel and Wickham and observed and photographed K.B. (*Id.* at 136-138).

{¶16} Special Agent Pauly and Detective Horn returned to Tiffin where they conducted a consent search of the residence where K.B. lived. (*Id.* at 138-139). Special Agent Pauly testified that Wickham, Miller, Wickham and Miller's 18-month-old daughter, R.M., and Miller's mother, father, and brother lived at the residence at the time. (*Id.* at 139). Special Agent Pauly and Detective Horn looked around the residence and took measurements and photographs of things like couches, bassinets, and beds. (*Id.* at 139-141).

{¶17} While at the residence, Special Agent Pauly interviewed Miller privately. (*Id.* at 141-142). Miller told Special Agent Pauly that R.M. was his and Wickham's daughter, but he was not sure whether he was K.B.'s father. (*Id.*). Miller said that he does not love K.B. the same way he loves R.M. (*Id.* at 143). Miller loves K.B. like his girlfriend's son or a nephew, not like a son. (*Id.*). Miller told Special Agent Pauly that if K.B. was fussy, he would hold him up in the air and drop him about eight inches onto the bed to try to shock him out of crying. (*Id.*). Miller demonstrated "stoppies" that he would perform by laying K.B. down in a stroller and jerking the stroller forward and backward. (*Id.* at 143-144).

{¶18} In the same conversation, Miller told Special Agent Pauly that on a couple of occasions, his elbow came down on top of K.B.'s head while Miller "zoned out" watching television. (*Id.* at 144). Miller also indicated that he would, with his right hand, push K.B.'s head down into his bassinet mattress to immobilize it and insert a pacifier into K.B.'s mouth, while slapping K.B.'s butt with his left hand to achieve a kind of rocking motion. (*Id.* at 145). Miller told Special Agent Pauly about one time when Miller got frustrated with K.B., so Miller hit at the same time the side of K.B.'s bassinet with his forearm and K.B.'s butt, which made a really loud noise that awoke Wickham. (*Id.*).

{¶19} Special Agent Pauly also spoke with the adults who lived at the residence, including Miller's mother, father, and brother. (*Id.* at 146, 259). He spoke with Dr. Moorjani. (*Id.*). Special Agent Pauly then conducted second interviews of Wickham and Miller. (*Id.*).

{¶20} Special Agent Pauly testified that at that point in his investigation, he narrowed his focus primarily on Miller. (*Id.* at 147). He testified that the second interview of Miller, which he and Lieutenant Michelle Craig conducted, was videotaped and audio-recorded at the Tiffin Police Department. (*Id.*). Special Agent Pauly identified as State's Exhibit 8 a DVD disc containing the recording of his second interview of Miller, which took place on March 15, 2012. (*Id.* at 149-150). The DVD disc containing the interview was then played for the jury. (*Id.* at 151-243).

{¶21} As depicted in the recorded interview, Special Agent Pauly informed Miller that he was not under arrest, that he did not have to answer questions, and that he was free to leave at any time. (*Id.* at 152). Miller described in his second interview how he would care for K.B. about two to three hours per day while Wickham rested. (*Id.* at 159-162). Miller testified that he would sometimes become frustrated with K.B. when he would cry or "piss all over the bed or on his face." (*Id.* at 164). He said that if he was frustrated with K.B., he "would try different techniques, until [he] ran out of patience," at which point he would wake

Wickham so she could take over and so Miller could smoke a cigarette or two. (*Id.* at 165-166).

**{¶22}** Miller recalled telling Special Agent Pauly about how he accidentally bumped K.B.'s head with his elbow on two occasions while sitting on the couch with Wickham and K.B. (*Id.* at 166). Miller demonstrated in the second interview using a baby dummy, but he admitted that he may have hit K.B.'s head a little harder than he demonstrated. (*Id.* at 167-168); (State's Ex. 8). Miller also demonstrated the time he got frustrated and smacked K.B. on the butt and, in doing so, hit the bassinet with his forearm, which shook the bassinet "pretty good," made a loud noise, and left "a couple red marks" on his forearm. (*Id.* at 170-172); (*Id.*). Miller said the loud noise also awoke Wickham, who "started bitching at [him], saying that [he] hit [K.B.]" and that she saw Miller "slam his head down, which [Miller] had been holding his head at the time down for a good two or three minutes." (Mar. 13-14, 2013 Tr., Vol. One, at 172). Miller also demonstrated how he would use his right hand to hold K.B.'s head down with his pacifier in his mouth, while patting and rocking his butt with his left hand. (*Id.* at 170, 172); (State's Ex. 8).

**{¶23}** Miller described his anger issues—he said, "[w]hat happens when I get angry is I get loud, I cuss, uhm, I bitch about something that doesn't need to be bitched about." (Mar. 13-14, 2013 Tr., Vol. One, at 173). He said meditation,

playing video games, and smoking cigarettes help distract him from situations that anger him. (*Id.*). At another point in the interview, Miller admitted that to help his frustration, he would call K.B. a "fuckin' retard" to "just piss [Wickham] off" after laying K.B. down in his bed and walking out of the room. (*Id.* at 195).

{¶24} Miller demonstrated in his second interview how he would drop K.B. about eight inches onto the bed to try to shock him out of crying. (*Id.* at 181); (State's Ex. 8). He also demonstrated how he would hold K.B. out in front of his body and support his neck and head with one hand while patting his butt with the other so his butt and legs went up into the air. (*Id.* at 182, 187-188); (*Id.*). Miller demonstrated how he would also sometimes hold K.B. the same way and lift him up and down, and he would sometimes lift K.B. up and down while holding him in such a way that K.B. was facing Miller. (*Id.* at 182, 189); (*Id.*).

{¶25} Miller demonstrated how he would hold R.M. upside down by her feet, sometimes lifting her up and down in that position "about four pumps." (*Id.* at 190); (*Id.*). Miller first told Special Agent Pauly and Lieutenant Craig in his second interview that he did not use that method with K.B; however, a few minutes later, he recalled that he did hold K.B. upside down for 15 seconds one time, applying pressure to the bottoms of K.B.'s feet, and he demonstrated that for Special Agent Pauly and Lieutenant Craig. (*Id.* at 190, 192-193); (*Id.*). Miller said he would sometimes use R.M.'s head to open doors, but that he never did that

with K.B. (*Id.* at 191); (*Id.*). At most, Miller said he used K.B.'s butt to push doors open. (Mar. 13-14, 2013 Tr., Vol. One, at 192).

{¶26} Miller demonstrated how he would tightly swaddle K.B. in a blanket, and when Special Agent Pauly asked him if he could see himself "having maybe pushed a little too hard on his belly," Miller responded, "[n]ot realizing it." (*Id.* at 199-200); (State's Ex. 8). Miller demonstrated the "stoppies" he would perform while K.B. was lying down in the stroller, quickly pushing the stroller forward and then pulling it back. (*Id.* at 200-202); (*Id.*). Miller admitted that he may have once or twice, out of frustration, grabbed K.B. and flipped him over quickly from his back to his belly. (*Id.* at 212-213); (*Id.*).

{¶27} Miller told Special Agent Pauly and Lieutenant Craig in the interview that in his sleep, he flips and flops and has kicked Wickham. (Mar. 13-14, 2013 Tr., Vol. One, at 214). He also said that while he is against having a baby sleep in bed with him, it has happened "more than I wanted." (*Id.* at 214-215).

{¶28} Miller explained that while he loved K.B. and planned to raise him as his own son, his love for K.B. is "slightly different" than his love for R.M., and he was intent on a paternity test because knowing whether K.B. is his son matters to him, including for legal purposes. (*Id.* at 216-220).

{¶29} Special Agent Pauly asked Miller whether his parenting techniques that he demonstrated in his second interview were proper ways to take care of a baby, and Miller responded, "[m]aybe not so much the bouncing. * * * To be honest, it's one of the few things that has been crossing my head that possibly could've given him shaken baby. I don't wanna think that." (*Id.* at 228). Miller said that he thought the bouncing may have been too much because he would "bring him down a little too fast." (*Id.* at 229). Miller demonstrated to "the extent [he could] remember" how Wickham would hold K.B. against her chest and bounce or rock K.B. up and down or back and forth, depending on whether Wickham was upright or lying down. (*Id.* at 231-232); (State's Ex. 8).

{¶30} Miller said he would like "to go into anger management and parenting classes" and for Wickham to do the same. (Mar. 13-14, 2013 Tr., Vol. One, at 232-233). Miller said he believed he should face "something" in the way of a punishment or consequence. (*Id.* at 233-234). When Special Agent Pauly asked Miller, "[b]ut you believe you've hurt him, just not intentionally," Miller responded, "I feel like there's a big possibility—bigger than what I originally had thought."[5] (*Id.* at 235); (State's Ex. 8). A few minutes later, after Special Agent Pauly stepped out of the interview room and Lieutenant Craig remained in the room with Miller, he told her, "to the best of my knowledge, I don't think it hurt

---

[5] The transcript of the trial indicates that Miller's response to Special Agent Pauly's question was partially inaudible. (Mar. 13-14, 2013 Tr., Vol. One, at 235). However, after reviewing State's Exhibit 8, we were able to discern Miller's full response. (State's Ex. 8).

him." (Mar. 13-14, 2013 Tr., Vol. One, at 237). Miller also told Lieutenant Craig, "the only thing I really think of in my mind could cause it is how [Wickham] bounces him and rocks him so hard." (*Id.*).

{¶31} Toward the end of the second interview, after Special Agent Pauly returned to the interview room, Miller demonstrated a "colic hold" he would use with K.B., where he would hold K.B. face-down across Miller's forearm and rock him back and forth or up and down and "exercise with him."[6] (*Id.* at 238-239); (State's Ex. 8). Miller said this technique worked "religiously" with K.B. (Mar. 13-14, 2013 Tr., Vol. One, at 238).

{¶32} Special Agent Pauly testified that Miller's demonstrations during the second interview of the techniques he used with K.B. were less extreme or severe than those during his first interview. (*Id.* at 148, 243-245). Specifically, Special Agent Pauly said that Miller's demonstrations of his hitting K.B. with his elbow, his stroller "stoppies," and his dropping of K.B. onto the bed were less severe than the demonstrations Miller offered in his first interview. (*Id.* at 244). According to Special Agent Pauly, in his second interview, Miller also exaggerated Wickham's rocking of K.B. compared to his demonstration of Wickham's conduct in his first interview. (*Id.* at 244-245).

---

[6] The transcript of the trial indicates that Miller said "exercise him," but after reviewing State's Exhibit 8, we discerned that he said "exercise with him." (Mar. 13-14, 2013 Tr., Vol. One, at 239); (State's Ex. 8).

{¶33} On cross-examination, Special Agent Pauly testified that when he and Detective Horn went to search the residence, his list of suspects included Wickham, Miller, and Miller's mother, father, and brother—in other words, the five adults who lived at the residence. (*Id.* at 247-248). Before searching the residence, Special Agent Pauly had spoken only with Wickham. (*Id.*). Special Agent Pauly testified that he used the same interrogation style at Miller's first and second interviews, but he admitted that he did not videotape or record or have a baby dummy available at the first interview. (*Id.* at 252-253). He could not recall if he told Miller that his second interview was being recorded. (*Id.* at 253-254). Special Agent Pauly testified that he determined Wickham was no longer a suspect after Miller's second interview, based on all of the interviews he conducted, including of Miller, the medical evidence, and the doctor's characterization of K.B.'s injuries. (*Id.* at 254, 257-258). He admitted that he did not take any physical evidence such as fingerprints or DNA. (*Id.* at 256). Special Agent Pauly testified that his interviews of Miller's mother, father, and brother lasted a total of a little over an hour and were not recorded. (*Id.* at 260).

{¶34} On re-direct examination, Special Agent Pauly testified that of the five initial suspects, only Miller indicated that he would drop K.B., pound on K.B.'s bassinet, hold K.B. upside down, and push K.B.'s stroller and jerk it back quickly. (*Id.* at 262).

{¶35} Detective Horn also testified. (*Id.* at 110-111). He accompanied Special Agent Pauly to Rainbow Hospital and spoke with medical personnel and Wickham. (*Id.* at 111-113). Detective Horn identified seven photographs of K.B., labeled State's Exhibits 1 through 7, that he took while at Rainbow Hospital. (*Id.* at 113-114); (State's Exs. 1-7). Detective Horn testified that the photographs depict a drainage tube in K.B.'s head. (*Id.* at 114); (*Id.*).

{¶36} The State's final witness was Dr. Lolita McDavid, the medical director of child advocacy and protection at Rainbow Hospital.[7] (Mar. 13-14, 2013 Tr., Vol. Two, at 275). She testified that the chief of neurosurgery requested that she do a consult with K.B. in the pediatric intensive care unit. (*Id*. at 279-280). After reviewing K.B.'s medical record, she determined his injuries included subdural hematomas (i.e., bleeding between the brain and the brain's dura covering) of different ages, mild diffuse brain parenchymal volume loss (i.e., the brain tissue is not as big as it should be), retinal hemorrhaging (i.e., blood in the back of the eyes), bleeding in the brain, and multiple rib fractures. (*Id.* at 280-285).

{¶37} Dr. McDavid testified that after performing the consult, she prepared a report, in which she concluded within a reasonable degree of medical certainty that inflicted non-accidental trauma caused K.B.'s injuries. (*Id.* at 285-286);

---

[7] The trial court qualified Dr. McDavid as an expert witness regarding medical diagnosis and treatment, as well as child abuse. (Mar. 13-14, 2013 Tr., Vol. Two, at 278).

(State's Ex. 9). She testified that there was a substantial risk of death from K.B.'s injuries. (Mar. 13-14, 2013 Tr., Vol. Two, at 287-288). Dr. McDavid explained the importance of supporting a baby's head and neck. (*Id.* at 288-289). Finally, she said that in her training and experience, child abuse typically stems from frustration and not knowing how to handle children. (*Id.* at 289).

{¶38} On cross-examination, Dr. McDavid testified that she had no reason to disagree with the ophthalmologist's conclusion that K.B.'s retinal hemorrhaging was consistent with trauma that occurred more than two weeks before. (*Id.* at 291-294). She said a variety of symptoms would lead a doctor to decide to conduct testing to determine whether a patient had retinal hemorrhaging. (*Id.* at 294-296). Dr. McDavid testified that rib fractures would not be caused by striking a child in the head, by holding a child upside down for 15 seconds, or by shaking the child's bassinet back and forth. (*Id.* at 298-299). She said she had never heard of rib fractures being caused by wrapping one's arms around a child and quickly rocking back and forth. (*Id.* at 299).

{¶39} Dr. McDavid testified that parents are educated on how to handle a newborn when the newborn is discharged from the hospital, and that only the mother would be educated if only the mother was present. (*Id.*). She admitted that a parent using techniques on a first child that did not injure the child would amount to a learning experience for the parent. (*Id.* at 300). Dr. McDavid

admitted that K.B.'s medical records did not indicate either of K.B.'s parents were frustrated, and her report did not mention stress or frustration. (*Id.* at 303, 317). Dr. McDavid identified Defendant's Exhibit A as K.B.'s patient daily note from Rainbow Hospital for March 4, 2012—part of K.B's medical record—which noted that Wickham "has been stressed lately." (*Id.* at 306-307, 310). Dr. McDavid testified that she did not include K.B.'s March 4, 2012 patient daily note in her report, nor did she recall reading it, and nor would she have included it in her report had she seen it. (*Id.* at 307-310, 316). While she believes "stress" and "frustration" are not synonymous, Dr. McDavid testified that stress is not necessarily part of frustration, but it can be. (*Id.* at 311-313).

{¶40} On re-direct examination, Dr. McDavid testified that parents whose children are sick and injured are commonly stressed, and a parent who went from Tiffin to Toledo to Cleveland might be a little stressed. (*Id.* at 317-318).

{¶41} After Dr. McDavid concluded her testimony, State's Exhibits 1 through 9 were admitted into the record, with State's Exhibits 1 through 7 being admitted over Miller's objection. (*Id.* at 319-320). The State rested, and the defense moved for acquittal pursuant to Crim.R. 29(A), which the trial court denied. (*Id.* at 321-322). Defendant's Exhibit A was admitted into the record without objection. (*Id.* at 322). The defense then rested. (*Id.* at 322). Counsel gave their closing arguments, and the trial court charged the jury. (*Id.* at 325-375).

{¶42} The jury found Miller guilty of endangering children, but further found "that the offense did not result in serious physical harm to the child," making the convicted offense a first-degree misdemeanor.  (Mar. 14, 2013 Verdict Tr. at 2-3); (Doc. No. 67).

{¶43} Because evidence of each element of endangering children under R.C. 2919.22(A) is present in the record, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶44} First, the State was required to prove that Miller "was the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen."  R.C. 2919.22(A).  *See also Miller*, 2007-Ohio-6711, at ¶ 12.  "In loco parentis" means "standing in the place of a parent and assuming parental duties or responsibilities" and describes "a person who has assumed the dominant parental role and relied upon by the child for support."  *State v. Knepley*, 3d Dist. Henry No. 7-11-02, 2012-Ohio-406, ¶ 11, citing 2 *Ohio Jury Instructions*, Section 507.03, at 10 (2011) and *State v. Noggle*, 67 Ohio St.3d 31 (1993), paragraph one of the syllabus (internal quotation marks omitted).

{¶45} K.B. was approximately three months old on March 1, 2012.  (Mar. 13-14, 2013 Tr., Vol. One, at 126).  Although the identity of K.B.'s biological father was uncertain, Miller described in his second interview how he would care

for K.B. about two to three hours per day while Wickham rested. (*Id.* at 159-162). Therefore, because evidence in the record demonstrated that Miller had control over K.B. and assumed parental duties and responsibilities, the jury did not clearly lose its way as to the first element of the offense.

**{¶46}** Second, the State was required to prove that Miller violated a duty of care, protection, or support to K.B. R.C. 2919.22(A). *See also Miller* at ¶ 12. By acting as K.B.'s parent and exercising control over him, Miller assumed parental duties and responsibilities, including the duties to protect and care for him. *Bloomingburg v. Grove*, 12th Dist. Fayette No. CA2009-06-009, 2010-Ohio-212, ¶ 15, citing *State v. Lott*, 135 Ohio App.3d 198, 202 (11th Dist.1999) and *State v. Sammons*, 58 Ohio St.2d 460, 462-463 (1979); *State v. Caton*, 137 Ohio App.3d 742, 749-750 (1st Dist.2000).

**{¶47}** In his second interview, the video of which was played for the jury, Miller admitted to: quickly jerking K.B.'s stroller back and forth; striking K.B. and his bassinet; holding K.B.'s head down while using his other hand to push on K.B.'s butt to achieve a rocking motion; hanging K.B. upside down for 15 seconds; dropping K.B. onto a bed; pushing too hard on K.B.'s belly; quickly flipping K.B. over in frustration; using K.B.'s butt to push open doors; and, allowing K.B. to sleep in the bed when Miller knew he flips and flops in his sleep and has kicked Wickham. (Mar. 13-14, 2013 Tr., Vol. One, at 170-172, 181, 192-

193, 199-202, 212-215); (State's Ex. 8). Special Agent Pauly testified that in Miller's second interview, he minimized the techniques he used with K.B. and exaggerated Wickham's. (Mar. 13-14, 2013 Tr., Vol. One, at 243-245). Miller admitted that at least "the bouncing" was not a proper way to care for a baby and that he may have hurt K.B. and given him "shaken baby." (*Id.* at 228, 235). Given all of this evidence, including Miller's admissions, we cannot conclude that the jury clearly lost its way as to the second element of the offense.

{¶48} Third, the State was required to prove that Miller created a substantial risk to the health or safety of K.B. R.C. 2919.22(A). *See also Miller* at ¶ 12. A "'[s]ubstantial risk' means a strong possibility, as contrasted with a remote or [even a] significant possibility, that a certain result may occur or that certain circumstances may exist." *State v. Hinojosa*, 3d Dist. Seneca No. 13-12-41, 2013-Ohio-4110, ¶ 33, quoting R.C. 2901.01(A)(8) (internal quotation marks omitted). *See also Ohio Jury Instructions*, CR Section 519.22 (Rev. May 4, 2013), citing *Ohio Jury Instructions*, CR Section 509.03 (2009) (adding "(even a)" to clarify the statutory definition).

{¶49} Dr. McDavid testified to the importance of using caution when handling an infant, particularly the infant's head and neck. (Mar. 13-14, 2013 Tr., Vol. Two, at 288-289). Miller admitted to several instances of conduct that could have led the jury to conclude he created substantial risks to K.B.'s health or safety.

For example, even though Miller knew he flips and flops and had kicked Wickham in his sleep, he still allowed K.B. to sleep in the same bed as him. (Mar. 13-14, 2013 Tr., Vol. One, at 214-215). K.B. suffered multiple rib fractures, and Miller admitted to quickly flipping K.B. over in frustration and to pushing too hard on K.B.'s belly. (*Id.* at 199-200, 212-213). In addition, Miller admitted to using techniques that caused K.B. to bounce, which he acknowledged was not a proper way to care for a baby. (*Id.* at 228). Based on this evidence, we cannot conclude that the jury clearly lost its way as to the third element of the offense.

{¶50} Finally, the State was required to prove that Miller acted recklessly. *Miller* at ¶ 12, citing *McGee*, 79 Ohio St.3d at 195. "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶51} Miller knew that "the bouncing" was not a proper way to care for a baby, and he acknowledged that it may have given K.B. "shaken baby." (Mar. 13-14, 2013 Tr., Vol. One, at 228). He knew he moved around in his sleep, but he still allowed K.B. to sleep in the same bed as him, perversely disregarding known risks. (*Id.* at 214-215). Miller admitted to mishandling K.B. out of frustration, with heedless indifference to the consequences. (*See, e.g., id.* at 212-213). The jury did not clearly lose its way as to the fourth element of the offense.

{¶52} Miller's arguments under his first assignment of error center on causation—in other words, he argues that there was no credible evidence presented that he caused K.B.'s injuries. However, causation is not an element of child endangering under R.C. 2919.22(A). *See Miller* at ¶ 12. *See also Hinojosa*, 2013-Ohio-4110, at ¶ 33, quoting *State v. Kamel*, 12 Ohio St.3d 306, 308 (1984) ("With regard to the child endangerment conviction, the Supreme Court of Ohio [h]as held that '[i]t is not necessary to show an actual instance or pattern of physical abuse on the part of the accused in order to justify a conviction under R.C. 2919.22(A).'"). A showing of causation is required, however, under R.C. 2919.22(E)(2)(c), which makes a violation of R.C. 2919.22(A) a third-degree felony, as opposed to a first-degree misdemeanor, if the violation "*results* in serious physical harm to the child involved * * *." (Emphasis added.) R.C. 2919.22(E)(2)(c). *See also Hinojosa* at ¶ 33, citing R.C. 2919.22(A) and *Kamel* at 308.

{¶53} Here, the jury found Miller guilty under R.C. 2919.22(A); however, it did *not* find that Miller's violation of R.C. 2919.22(A) resulted in serious physical harm to K.B. under R.C. 2919.22(E)(2)(c). Therefore, the question is not whether Miller's actions caused K.B.'s injuries, and his fixation on causation misses the mark. Rather, the record contains evidence that Miller recklessly "create[d] a substantial risk to the health or safety of the child, by violating a duty

of care, protection, or support," and we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

{¶54} Miller's first assignment of error is overruled.

### Assignment of Error No. II

**Rodney Banks, Jr. [sic] was deprived of his rights to effective assistance of counsel by his counsel, in contravention of the Sixth and Fourteenth Amendments to the United States Constitution, and Article One, Section Ten of the Ohio Constitution, which gravely prejudiced the rights of the Appellant and did not further the administration of justice.**

{¶55} In his second assignment of error,[8] Miller argues that he was denied effective assistance of trial counsel and prejudiced when trial counsel "failed to object when the Prosecutor in his opening statement mischaracterized and deliberately exaggerated the actions that [Miller] took to stop K.B. from crying." (Appellant's Brief at 13).

{¶56} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that

---

[8] We consider Miller's second assignment of error notwithstanding its containing the name Rodney Banks, Jr. as opposed to Miller.

counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland*, 466 U.S. at 687.

**{¶57}** Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

**{¶58}** Miller cannot prove the first prong of the *Strickland* test because Miller's counsel's failure to object during the State's opening statement was not deficient or unreasonable under the circumstances. "Opening statements are not intended to be a verbatim recitation of what evidence will in fact be presented to the jury." *State v. Hamilton*, 12th Dist. Clermont No. CA2001-04-044, 2002 WL 205489, *4 (Feb. 11, 2002). Rather, "[t]he purpose of opening statements is to inform the jury of the nature of the case and to outline the facts that each party will attempt to prove." *State v. Risner*, 3d Dist. Logan No. 8-12-02, 2012-Ohio-5954, ¶ 27, quoting *Maggio v. Cleveland*, 151 Ohio St. 136 (1949), paragraph one of the

syllabus (internal quotation marks omitted). "The opening statements of counsel are not evidence." *Id.*, citing *State v. Frazier*, 73 Ohio St.3d 323, 338 (1995).

{¶59} It is "within counsel's realm of tactical decision-making to choose to avoid interrupting opening statement to voice an objection." *E. Cleveland v. Waters*, 8th Dist. Cuyahoga No. 91631, 2009-Ohio-3591, ¶ 27, citing *State v. Keene*, 81 Ohio St.3d 646, 668 (1998). *See also State v. Patterson*, 10th Dist. Franklin No. 97APA12-1682, 1998 WL 655388, *6 (Sept. 22, 1998) ("Objections tend to disrupt the flow of trial and can be viewed as technical and bothersome. * * * Opting not to object to the opening statement comments was a reasonable judgment-call by defense counsel." (citation and internal quotation marks omitted)). "The failure to object to prosecutorial misconduct 'does not constitute ineffective assistance of counsel per se, as that failure may be justified as a tactical decision.'" *Waters* at ¶ 27, quoting *State v. Gumm*, 73 Ohio St.3d 413, 428 (1995).

{¶60} Even assuming the State's opening statement contained mischaracterizations and exaggerations—a dubious assumption given the evidence introduced at trial—it was a reasonable judgment call by Miller's trial counsel not to object during the State's opening statement. Indeed, the jury's first in-trial impression of Miller's trial counsel may have been an interruption of the State's opening statement, all for an overruled objection. Worse yet, had the jury

disagreed with Miller's contention that the State mischaracterized and exaggerated the evidence to be presented, it may have concluded that Miller and his trial counsel were attempting to minimize his actions, as Miller tried to do in his second interview. For these reasons, Miller's trial counsel did not perform deficiently or unreasonably under the circumstances. Because Miller cannot satisfy the first prong of the *Strickland* test, we need not proceed to the second.

**{¶61}** Miller's second assignment of error is overruled.

**{¶62}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and ROGERS, J., concur.**